This opinion is uncorrected and subject to revision before publication in the New York Reports.
-----------------------------------------------------------------

77
Sara Myers et al.,
          Plaintiffs,
Eric A. Seiff, et al.,
          Appellants,
        v.
Eric Schneiderman, &c.,
          Respondent,
et al.,
          Defendants.
          Edwin G. Schallert, for appellants.
          Anisha S. Dasgupta, for respondent.
          Michael R. Aiello, et al.; New York State Catholic Conference; Not Dead Yet, et al.; New York Civil Liberties Union; Alan A. Pfeffer et al.; Agudath Israel of America; New York Chapter of the National Academy of Elder Law Attorneys; American Medical Student Association, et al.; Richard N. Gottfried, et al.; Betty Rollin, et al.; National Association of Criminal Defense Lawyers; Vincent Bonventre, et al.; Unitarian Universalist Association, et al.; Compassion & Choices, amici curiae.


Per Curiam:


          Plaintiffs ask us to declare a constitutional right to "aid-in-dying," which they define (and we refer to herein) as the right of a mentally competent and terminally ill person to obtain a prescription for a lethal dosage of drugs from a physician, to be taken at some point to cause death.  Although New York has long recognized a competent adult's right to forgo life-saving medical care, we reject plaintiffs' argument that an individual

- 1 -

has a fundamental constitutional right to aid-in-dying as they define it.  We also reject plaintiffs' assertion that the State's prohibition on assisted suicide is not rationally related to legitimate state interests.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiffs filed the instant action against New York State's Attorney General and several District Attorneys,[1] requesting declaratory and injunctive relief to permit "aid-in-dying," whereby a mentally competent, terminally ill patient may obtain a prescription from a physician to cause death. Plaintiffs request a declaratory judgment that physicians who provide aid-in-dying in this manner are not criminally liable under the State's assisted suicide statutes -- Penal Law § 120.30 and § 125.15 (3).[2]  They further request an injunction prohibiting the prosecution of physicians who issue such prescriptions to terminally ill, mentally competent patients.

When the complaint was filed, plaintiffs included three

---

[1] Plaintiffs discontinued the action against the District Attorneys after entering into a stipulation that all parties would be bound by any result reached in the litigation between plaintiffs and the Attorney General.

[2] Penal Law § 120.30 provides that "[a] person is guilty of promoting a suicide attempt when [such individual] intentionally causes or aids another person to attempt suicide."  Penal Law § 125.15 (3) provides that "[a] person is guilty of manslaughter in the second degree when . . . [such person] intentionally causes or aids another person to commit suicide."

mentally competent, terminally ill patients.  Two of those plaintiffs have died, and the third is in remission.  Plaintiffs also include individual medical providers who assert that fear of prosecution has prevented them from exercising their best professional judgment when counseling and treating their patients.  They are joined by organizational plaintiff End of Life Choices, which sued on its own behalf and on behalf of its clients, for whom it provides "information and counseling on informed choices in end of-of-life decisionmaking."

The Attorney General moved to dismiss the complaint on the grounds that plaintiffs failed to state a cause of action and did not present a justiciable controversy (see CPLR 3211 [a] [7], [2]).  Supreme Court granted the motion, and plaintiffs appealed. The Appellate Division modified on the law, declaring that the assisted suicide statutes provide a valid statutory basis to prosecute physicians who provide aid-in-dying and that the statutes do not violate the State Constitution, and as so modified, affirmed (140 AD3d 51, 65 [1st Dept 2016]).  Plaintiffs appealed to this Court as of right, pursuant to CPLR 5601 (b) (1).

On appeal, plaintiffs argue that the State's assisted suicide statutes do not prohibit aid-in-dying as a matter of law, and that the Appellate Division's "literal" interpretation of the statutes is flawed.  Alternatively, plaintiffs contend that application of the assisted suicide statutes to aid-in-dying

violates their equal protection and due process rights under the
State Constitution.

## II.  REVIEWABILITY

"On a motion to dismiss pursuant to CPLR 3211, the
pleading is to be afforded a liberal construction" (Leon v
Martinez, 84 NY2d 83, 87-88 [1994], citing CPLR 3026).  "We
accept the facts as alleged in the complaint as true, accord
plaintiffs the benefit of every possible favorable inference, and
determine only whether the facts as alleged fit within any
cognizable legal theory" (id.).  "However, 'allegations
consisting of bare legal conclusions, as well as factual claims
inherently incredible or flatly contradicted by documentary
evidence are not entitled to such consideration'" (Simkin v
Blank, 19 NY3d 46, 52 [2012], quoting Maas v Cornell Univ., 94
NY2d 87, 91 [1999]; see Connaughton v Chipotle Mexican Grill,
Inc., 29 NY3d 137, 142-143 [2017]).

We reject plaintiffs' argument that the lower courts
improperly resolved numerous factual issues.  This case involves
questions of law, including: whether aid-in-dying constitutes
assisted suicide within the meaning of the Penal Law; whether a
competent terminally ill person has a fundamental right to
physician-assisted suicide; and whether denying a competent,
terminally ill patient aid-in-dying violates that patient's right
to equal treatment under the law.  As there are no countervailing

reasonable interpretations, these questions can be decided without any factual development.

### III. PLAINTIFFS' STATUTORY CLAIM

Plaintiffs initially assert that we should interpret the assisted suicide statutes to exclude physicians who provide aid-in-dying. Such a reading would run counter to our fundamental tenets of statutory construction, and would require that we read into the statutes words and meaning wholly absent from their text (see Majewski v Broadalbin-Perth Cent. Sch. Dist., 91 NY2d 577, 583 [1998]).

"The governing rule of statutory construction is that courts are obliged to interpret a statute to effectuate the intent of the Legislature, and when the statutory language is clear and unambiguous, it should be construed so as to give effect to the plain meaning of the words used" (People v Finnegan, 85 NY2d 53, 58 [1995] [internal quotation omitted]). "[C]ourts may not reject a literal construction [of a statute] unless it is evident that a literal construction does not correctly reflect the legislative intent" (Matter of Schinasi, 277 NY 252, 259 [1938]).

"Suicide" is not defined in the Penal Law, and therefore "we must give the term its ordinary and commonly understood meaning" (People v Ocasio, 28 NY3d 178, 181 [2016] [internal quotations omitted]). Suicide has long been understood

as "the act or an instance of taking one's own life voluntarily and intentionally" (Webster's Collegiate Dictionary [11th ed 2003]; see Webster's American Dictionary of the English Language [ed 1828]).  Black's Law Dictionary defines "suicide" as "[t]he act of taking one's own life," and "assisted suicide" as "[t]he intentional act of providing a person with the medical means or the medical knowledge to commit suicide" (10th ed 2014).  Aid-in-dying falls squarely within the ordinary meaning of the statutory prohibition on assisting a suicide.

The assisted suicide statutes apply to anyone who assists an attempted or completed suicide.  There are no exceptions, and the statutes are unqualified in scope, creating an "irrefutable inference . . . that what is omitted or not included was intended to be omitted or excluded" (People v Jackson, 87 NY2d 782, 788 [1996] [internal quotation omitted]).  Furthermore, this Court previously resolved any doubt as to the scope of the ban on assisted suicide.  In People v Duffy, we explained that "section 125.15 (3)'s proscription against intentionally causing or aiding a suicide applies even where the defendant is motivated by 'sympathetic' concerns, such as the desire to relieve a terminally ill person from the agony of a painful disease" (79 NY2d 611, 615 [1992], citing Staff Notes of the Commission on Revision of the Penal Law, Proposed New York Penal Law, McKinney's Spec. Pamph. [1964], at 339).

As written, the assisted suicide statutes apply to a

physician who intentionally prescribes a lethal dosage of a drug because such act constitutes "promoting a suicide attempt" (Penal Law § 120.30) or "aid[ing] another person to commit suicide" (Penal Law § 125.15 [3]).  We therefore reject plaintiffs' statutory construction claim.

## IV. PLAINTIFFS' CONSTITUTIONAL CLAIMS

Alternatively, plaintiffs claim that the assisted suicide statutes, if applied to aid-in-dying, would violate their rights under the Equal Protection and Due Process Clauses of our State Constitution.  We reject those claims.

## A.  Equal Protection

Plaintiffs allege that the assisted suicide statutes violate the State Equal Protection Clause because some, but not all, patients may hasten death by directing the withdrawal or withholding of life-sustaining medical assistance.  Plaintiffs therefore contend that the criminalization of aid-in-dying discriminates unlawfully between those terminally ill patients who can choose to die by declining life-sustaining medical assistance, and those who cannot.

Our State's equal protection guarantees are coextensive with the rights protected under the federal Equal Protection Clause (see People v Aviles, 28 NY3d 497, 502 [2016]; Esler v Walters, 56 NY2d 306, 313-314 [1982]).  In Vacco v Quill, the

United States Supreme Court held that New York State's laws banning assisted suicide do not unconstitutionally distinguish between individuals (521 US 793, 797 [1997]). As the Court explained, "[e]veryone, regardless of physical condition, is entitled, if competent, to refuse unwanted lifesaving medical treatment; no one is permitted to assist a suicide. Generally, laws that apply evenhandedly to all unquestionably comply with equal protection" (id. at 800 [emphasis in original]). The Supreme Court has not retreated from that conclusion, and we see no reason to hold otherwise.

B.  Due Process

In support of their due process argument, plaintiffs assert that their fundamental right to self-determination and to control the course of their medical treatment encompasses the right to choose aid-in-dying. They further assert that the assisted suicide statutes unconstitutionally burden that fundamental right.

In Washington v Glucksberg, the United States Supreme Court "examin[ed] our Nation's history, legal traditions, and practices," and concluded that "the asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause" of the Federal Constitution (521 US 702, 710, 728 [1997]). We have, at times, held that our State Due Process Clause provides greater

protections than its federal counterpart (see Aviles, 28 NY3d at 505), and therefore Supreme Court precedent rejecting plaintiffs' claim as a matter of federal constitutional due process is not dispositive. Accordingly, we turn to whether the right claimed here falls within the ambit of that broader State protection.

Contrary to plaintiffs' claim, we have never defined one's right to choose among medical treatments, or to refuse life-saving medical treatments, to include any broader "right to die" or still broader right to obtain assistance from another to end one's life. In Schloendorff v Society of New York Hospital, we held that a surgeon who performed an operation without the patient's consent committed an assault and, in that context, we noted that "[e]very human being of adult years and sound mind has a right to determine what shall be done with [such person's] own body" (211 NY 125, 129-130 [1914]). Matter of Storar likewise concerned the right to refuse life-sustaining medical treatment when the patients were not mentally competent (52 NY2d 363, 377 [1981]). In Rivers v Katz, holding that involuntarily committed mental patients have a fundamental right to refuse antipsychotic medication, we concluded that a patient's right "to refuse medical treatment must be honored, even though the recommended treatment may be beneficial or even necessary to preserve the patient's life" (67 NY2d 485, 492 [1986]).

We have consistently adopted the well-established distinction between refusing life-sustaining treatment and

assisted suicide (see Matter of Bezio v Dorsey, 21 NY3d 93, 103 [2013]; Matter of Fosmire v Nicoleau, 75 NY2d 218, 227 [1990]; Storar, 52 NY2d at 377 n 6). The right to refuse medical intervention is at least partially rooted in notions of bodily integrity, as the right to refuse treatment is a consequence of a person's right to resist unwanted bodily invasions (see Cruzan v Director, Mo. Dept. of Health, 497 US 261, 269-270 [1990]; Schloendorff, 211 NY at 130). In the case of the terminally ill, refusing treatment involves declining life-sustaining techniques that intervene to delay death. Aid-in-dying, by contrast, involves a physician actively prescribing lethal drugs for the purpose of directly causing the patient's death. As the Court stated in Matter of Fosmire v Nicoleau, "[i]n many if not most instances the State stays its hand and permits fully competent adults to engage in conduct or make personal decisions which pose risks to their lives or health," however, "[t]he State will intervene to prevent suicide" (75 NY2d at 227).

"[M]erely declining medical care, even essential treatment, is not considered a suicidal act" (id.). Although we do not reach the issue addressed by Judge Rivera's concurrence on this appeal, the Supreme Court has noted that "the distinction between assisting suicide and withdrawing life-sustaining treatment, a distinction widely recognized and endorsed in the medical profession and in our legal traditions, is both important and logical; it is certainly rational," and it turns on

"fundamental legal principles of causation and intent" (Vacco, 521 US at 801). As a general matter, the law has "long used actors' intent or purpose to distinguish between two acts that may have the same result" (id. at 802; see also Bezio, 21 NY3d at 103, quoting Von Holden v Chapman, 87 AD2d 66, 70 [4th Dept 1982]).

The right asserted by plaintiffs is not fundamental, and therefore the assisted suicide statutes need only be rationally related to a legitimate government interest (see People v Knox, 12 NY3d 60, 67 [2009]). "The rational basis test is not a demanding one" (id. at 69); rather, it is "the most relaxed and tolerant form of judicial scrutiny" (Dallas v Stanglin, 490 US 19, 26 [1989]). Rational basis involves a "strong presumption" that the challenged legislation is valid, and "a party contending otherwise bears the heavy burden of showing that a statute is so unrelated to the achievement of any combination of legitimate purposes as to be irrational" (id. at 69). A challenged statute will survive rational basis review so long as it is "rationally related to any conceivable legitimate State purpose" (People v Walker, 81 NY2d 661, 668 [1993] [citation omitted]). "Indeed, courts may even hypothesize the Legislature's motivation or possible legitimate purpose" (Affronti v Crosson, 95 NY2d 713, 719 [2001] [citation omitted]). At bottom, "[t]he rational basis standard is a paradigm of judicial restraint" (id. [citation omitted]).

As to the right asserted here, the State pursues a legitimate purpose in guarding against the risks of mistake and abuse.  The State may rationally seek to prevent the distribution of prescriptions for lethal dosages of drugs that could, upon fulfillment, be deliberately or accidentally misused.  The State also has a significant interest in preserving life and preventing suicide, a serious public health problem (see Bezio, 21 NY3d at 104; Storar, 52 NY2d at 377; see also Glucksberg, 521 US at 729).  As summarized by the Supreme Court, the State's interests in prohibiting assisted suicide include: "prohibiting intentional killing and preserving life; preventing suicide; maintaining physicians' role as their patients' healers; protecting vulnerable people from indifference, prejudice, and psychological and financial pressure to end their lives; and avoiding a possible slide towards euthanasia" (Vacco, 521 US at 808-809).  These legitimate and important State interests further "satisfy the constitutional requirement that a legislative classification bear a rational relation to some legitimate end" (id. at 809).

These interests are long-standing.  As the Supreme Court observed, "[t]he earliest American statute explicitly to outlaw assisting suicide was enacted in New York in 1828" (Glucksberg, 521 US at 715 [citation omitted]).  New York's Task Force on Life and the Law, which was first convened in 1984, carefully studied issues surrounding physician-assisted suicide and "unanimously concluded that [l]egalizing assisted suicide and

euthanasia would pose profound risks to many individuals who are ill and vulnerable" and that the "potential danger[s] of this dramatic change in public policy would outweigh any benefit that might be achieved" (id. at 719 [citation omitted]).  The Legislature has periodically examined that ban -- including in recent years -- and has repeatedly rejected attempts to legalize physician-assisted suicide in New York.

The Legislature may conclude that those dangers can be effectively regulated and specify the conditions under which it will permit aid-in-dying.  Indeed, the jurisdictions that have permitted the practice have done so only through considered legislative action (see Or Rev Stat Ann §§ 127.800 - 127.897 [enacted in 1997]; Wash Rev Code §§ 70.245.010 - 70.245.904 [enacted in 2008]; 18 Vt Stat Ann ch 113 [enacted in 2013]; California End of Life Option Act, Cal. Health & Safety Code pt 1.85 [enacted in 2015]; Colorado Rev Stat §§ 25-48-101 - 25-48-123 [enacted in 2016]; D.C. Act 21-577 [enacted in 2016]), and those courts to have considered this issue with respect to their own State Constitutions have rejected similar constitutional arguments (see Morris v Brandenburg, 2016-NMSC-027, 376 P3d 836, 843 [2016]; Sampson v State of Alaska, 31 P3d 88 [Alaska 2001]; Krischer v McIver, 697 So 2d 97, 104 [Fla 1997]; People v Kevorkian, 447 Mich 436, 446, 527 NW2d 714, 717 [1994]; see also Donaldson v Lungren, 2 Cal App 4th

1614, 1622, 4 Cal Rptr 2d 59, 63 [Cal Ct App 1992]).[3]  At present, the Legislature of this State has permissibly concluded that an absolute ban on assisted suicide is the most reliable, effective, and administrable means of protecting against its dangers (see Glucksberg, 521 US at 731-733).

### V. CONCLUSION

Our Legislature has a rational basis for criminalizing assisted suicide, and plaintiffs have no constitutional right to the relief they seek herein.  Accordingly, the order of the Appellate Division should be affirmed, without costs.

---

[3] The Supreme Court of Montana has held that a statutory consent defense protects physicians from prosecution for physician-assisted suicide, but it did not reach the constitutional question (see Baxter v State, 2009 MT 449, ¶ 50, 354 Mont 234, 251, 224 P3d 1211, 1222 [2009]).

Myers v Schneiderman

No. 77

RIVERA, J.(concurring):

Our state and federal constitutions guarantee heightened due process protections against unjustified government interference with the liberty of all persons to make certain deeply personal choices (NY Const, art I, § 6; US Const, 14th Amend; see also Rivers v Katz, 67 NY2d 485, 492-493 [1986]; Obergefell v Hodges, 135 S Ct 2584, 2597 [2015]).  This conception of liberty is grounded in notions of individual freedom, personal autonomy, dignity, and self-determination (see Rivers, 67 NY2d at 493; Planned Parenthood of Southeastern Pa. v Casey, 505 US 833, 857 [1992]; Lawrence v Texas, 539 US 558, 562 [2003] ["Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct."]; John P. Safranek, M.D. & Stephen J. Safranek, Can the Right to Autonomy Be Resuscitated After Glucksberg?, 69 U Colo L Rev 731, 733-742 [1998]).[1]  "At the heart of liberty is the right

_____

   [1] There is a rich debate taking place over centuries discussing the meaning of the term "dignity," and the significance of the concept remains controversial today (see generally Richard E. Ashcroft, Making Sense of Dignity, 31 J Med Ethics 679 [2005]).  As used here, the term is intended to evoke an individual's freedom to pursue autonomously chosen goals as well as an individual's need to be free from debasement and humiliation, broadly conceived (id. at 681).

- 1 -

to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life" (Casey, 505 US at 851).

On this appeal, the plaintiffs essentially seek a declaration that mentally competent, terminally-ill patients have an unrestricted State constitutional right to physician-prescribed medications that hasten death. I concur with the Court that this broad right as defined by plaintiffs is not guaranteed under the New York State Constitution, and that the State has compelling and legitimate interests in prohibiting unlimited and unconditional access to physician-assisted suicide.[2] These interests, however, are not absolute or unconditional. In particular, the State's interests in protecting and promoting life diminish when a mentally-competent, terminally-ill person approaches the final stage of the dying process that is agonizingly painful and debilitating. In such a situation, the State cannot prevent the inevitable, and its interests do not outweigh either the individual's right to self-determination or the freedom to choose a death that comports with the individual's values and sense of dignity. Given that the State already permits a physician to take affirmative steps to

---

[2] I agree with the Court's analysis that what plaintiffs call "aid-in-dying" is assisted-suicide within the meaning of our criminal law (per curiam at 5-7), and that the plaintiffs' equal protection claim is without merit (id. at 7-8). I address only the rights of the terminally ill under the State Due Process Clause.

comply with a patient's request to hasten death, and that the
State concedes that the Legislature could permit the practice
sought by plaintiffs, the State's interests lack constitutional
force for this specific sub-group of patients. Considering the
State's sanctioning of terminal sedation in particular, the
statute does not survive rational basis review. Therefore, in my
view, the State may not unduly burden a terminally-ill patient's
access to physician-prescribed medication that allows the patient
in the last painful stage of life to achieve a peaceful death as
the end draws near.[3]

I.

"Death will be different for each of us. For many, the
last days will be spent in physical pain and perhaps the despair
that accompanies physical deterioration and a loss of control of
basic bodily and mental functions. Some will seek medication to
alleviate that pain and other symptoms" (Washington v Glucksberg,
521 US 702, 736 [1997] [O'Connor, J. concurring]). Justice
O'Connor's poignant description of the end of life is familiar to
plaintiffs, who included, at the time the complaint was filed,
three mentally competent, terminally-ill adults. These patient-

---

[3] Lest my intention be misconstrued, I do not write to
expound on plaintiffs' State due process rights as limited by
their complaint, but rather to address the State's position that
its interests outweigh the rights of all terminally-ill patients
regardless of their condition.

plaintiffs expressed a desire for more than pain management; they sought to maintain a sense of dignity, autonomy, and personal integrity in the face of death, which they claimed had been compromised by both their respective illnesses and by the State's prohibition on assisted suicide. They requested judicial recognition of a right to decide how and when to die by accessing medication that would permit each of them to put an immediate end to their respective suffering.

Two of these patient-plaintiffs have since passed. When the complaint was filed, one plaintiff was 62 years old and suffered from Lou Gehrig's disease, a neurodegenerative condition without a cure. As the disease took hold, she was in constant pain and "fe[lt] trapped in a torture chamber of her own deteriorating body," fully aware of all that was transpiring to her physically and, worse yet, that the agonizing pain would persist for the rest of her days. She sought relief in the form of prescription medications that she could ingest "to achieve a peaceful death."

The other deceased patient-plaintiff was 57 years old and terminally ill with acquired immune deficiency syndrome (AIDS). A regimen of several medications kept him alive. He suffered from a variety of ailments and, as a consequence, had part of his foot amputated. He developed laryngeal carcinoma, which necessitated a tracheotomy that made it difficult for him to speak. He took more than 24 medications either through his

feeding tube or by injection, and required morphine for pain management.  He slept 19 hours a day and spent most of his five waking hours cleaning and maintaining his feeding and oxygen tubes, and taking his daily medications and injections. According to the complaint, he "wishe[d] to have the comfort of knowing that, if and when his suffering [became] unbearable, he [could] ingest medications prescribed by his doctor to achieve a peaceful death."

The surviving patient-plaintiff is in his eighties.  He developed cancer and, after surgery to remove his bladder, suffered a recurrence but is now in remission.  The complaint states that he wants "to be sure that if the cancer progresses to a terminal state, and he finds himself in a dying process he determines to be unbearable, he has available to him the option of aid-in-dying."

These patient-plaintiffs, joined by a group of physicians practicing end-of-life care and the non-profit End of Life Choices New York, challenge the application of New York's Penal Law to physicians who are willing to provide mentally competent, terminally-ill patients, like the named patient-plaintiffs, with a prescription for medication that they could ingest to end their lives before they succumb to the ravages of their illnesses.  These providers maintain that aid-in-dying is a medically and ethically appropriate treatment that should be legally available to patients.  They are supported by several

amici, including professional organizations such as the American Medical Student Association, American Medical Women's Association, American College of Legal Medicine, National Academy of Elder Law Attorneys, and amici representing several surviving family members who have witnessed the death of a loved one, and who describe the emotional impact and stress endured by the family caregivers.

The stories retold by patient-plaintiffs and amici family survivors describe the painful and harrowing experiences many terminally-ill patients endure in the final stage of life. The dying process, candidly recounted, illustrates the struggle of the terminally ill to live and die on their own terms, and is a vivid reminder of the fragility of human existence. It also provides necessary context for the legal analysis.

## II.

Constitutional limits on governmental interference with individual liberty have long included protection of the fundamental right to bodily integrity (Rivers, 67 NY2d at 492; Matter of Bezio v Dorsey, 21 NY3d 93, 119 [2013]; Glucksberg, 521 US at 720; Vacco v Quill, 521 US 793, 807 [1997]). Courts have recognized that decisions about what may or may not be done to one's body are "central to personal dignity and autonomy" and so are subject to heightened scrutiny (Casey, 505 US at 851; Cruzan v Dir., Missouri Dep't of Health, 497 US 261, 278 [1990]). While

we have not defined its outer limit, "[t]his Court has repeatedly construed the State Constitution's Due Process Clause to provide greater protection than its federal counterpart as construed by the Supreme Court" (People v LaValle, 3 NY3d 88, 127 [2004]; see also People v Scott, 79 NY2d 474, 496 [1992]).

Patients in New York State unquestionably have certain fundamental rights regarding medical treatment. In Rivers v Katz, this Court stated that "[i]t is a firmly established principle of the common law of New York that every individual of adult years and sound mind has a right to determine what shall be done with his own body" (67 NY2d at 492). The Court continued,

> "[i]n our system of a free government, where notions of individual autonomy and free choice are cherished, it is the individual who must have the final say in respect to decisions regarding [his or her] medical treatment in order to insure that the greatest possible protection is accorded [his or her] autonomy and freedom from unwanted interference with the furtherance of [his or her] own desires" (id. at 493).

A few years later, this Court noted that "the State rarely acts to protect individuals from themselves, indicating that the State's interest is less substantial when there is little or no risk of direct injury to the public. This is consistent with the primary function of the State to preserve and promote liberty and the personal autonomy of the individual" (Matter of Fosmire v Nicoleau, 75 NY2d 218, 227 [1990]). As such, the "fundamental common-law right [of refusing medical treatment] is coextensive with the patient's liberty interest protected by the due process

clause of our State Constitution" (Rivers, 67 NY2d at 493).

While this language may seem to countenance aid-in-dying, there are important caveats. First, the right to refuse medical treatment, while fundamental, "is not absolute and in some circumstances may have to yield to superior interests of the State" (Fosmire, 75 NY2d at 226). If a challenged statute infringes on a fundamental right, "it must withstand strict scrutiny and is void unless necessary to promote a compelling State interest and narrowly tailored to achieve that purpose" (Golden v Clark, 76 NY2d 618, 623 [1990]). It is for the courts "to weigh the interest of the individual against the interests asserted on behalf of the State to strike an appropriate balance" (Fosmire, 75 NY2d at 226-227). Second, the Court has, as the per curiam makes clear, consistently distinguished between refusing life-sustaining or life-saving medical treatment and assisting suicide (see Bezio, 21 NY3d at 103; Fosmire, 75 NY2d at 227; Matter of Storar, 52 NY2d 363, 377 n 6 [1981]; per curiam at 9-11). Across these cases the Court has held that an individual has a fundamental right to refuse medical treatment but, implicitly, not to physician-assisted suicide.

Even though this Court's precedent establishes that the right to control medical treatment generally does not extend to assisted suicide, because the criminal statutes challenged on this appeal effect a curtailment of patients' liberty, the State's prohibition must still be rationally related to a

legitimate government interest (People v Knox, 12 NY3d 60, 67 [2009]). The Court here highlights how the State's legitimate interest in protecting life has led it to make a rational distinction between permitting a patient to refuse life-sustaining medical treatment and a ban on assisted suicide (per curiam at 12-13; see e.g. Bezio, 21 NY3d at 103). This interest extends to protecting the lives of the terminally ill, as does the rational link between this interest and prohibiting assisted suicide. There are several bases on which the State may justify prohibiting physician-assisted suicide for the terminally ill in most cases: a terminal diagnosis may be incorrect, or at least underestimate the time a patient has left; palliative care can often reduce a patient's will to die, whether caused by physical pain or depression, and thus prolong life; vulnerable, terminally-ill patients could face external influences encouraging them to hasten their deaths, such as familial or financial pressure; the fear of opening the door to voluntary and involuntary euthanasia; and, finally, the possible negative impact on the integrity and ethics of the medical profession.

I agree, on constraint of this prior case law, that the right of a patient to determine the course of medical treatment does not, in general, encompass an unrestricted right to assisted suicide, and the State's prohibition of this practice in the vast majority of situations is rationally related to its legitimate interests. Nevertheless, this conclusion does not support the

State's position that its interests are always superior to and outweigh the rights of the terminally ill.  In particular, when these patients are facing an impending painful death, their own interest may predominate.  For the reasons I discuss, in those limited circumstances in which a patient seeks access to medical treatment options that end pain and hasten death, with the consent of a treating physician acting on best professional judgment, the State's interest is diminished and outweighed by the patient's liberty interest in personal autonomy.

                              III.

        The liberty interest protected by our State Constitution is broader than the right to decline medical treatment.  At its core, liberty is the right to define oneself through deeply personal choices that form a lifetime of human experience (Casey, 505 US at 851; Rivers, 67 NY2d at 493).  As we have stated "to preserve and promote liberty and the personal autonomy of the individual" is "the primary function of the State" (Fosmire, 75 NY2d at 227).

        An individual's interests in autonomy and freedom are not less substantial when facing the choice of how to bear the suffering and physical pain of a terminal illness at the end of life.  Self-determination includes the freedom to make decisions about how to die just as surely as it includes decision making about life's most private matters -- e.g. sexuality, marriage,

procreation, and child rearing -- all choices that reflect
personal beliefs and desires (see e.g. Lawrence, 539 US at 567;
Brooke S.B. v Elizabeth A.C.C., 28 NY3d 1, 26 [2016]).  As the
United States Supreme Court has recognized, "[t]he choice between
life and death is a deeply personal decision of obvious and
overwhelming finality" Cruzan, 497 US at 281).

For the terminally ill patient who is experiencing
intractable pain and suffering that cannot be adequately
alleviated by palliative care, plaintiffs and amici affirm that
the ability to control the end stage of the dying process and
achieve a peaceful death may lead to a renewed sense of autonomy
and freedom.[4]  So while the State's interest in protecting life
is paramount, the law requires that we balance that interest
against those of an individual facing an imminent and unbearably
painful death.  Contrary to the State's argument, the
government's interest in protecting life diminishes as death
draws near, as that interest "does not have the same force for a
terminally ill patient faced not with the choice of whether to

---

[4] It is worth noting that in her Glucksberg concurrence,
Justice O'Connor was operating on the assumption that *all* dying
patients in Washington and New York could obtain palliative care
that would relieve their suffering.  As a result, she did not
reach the narrower question of "whether a mentally competent
person who is experiencing great suffering has a constitutionally
cognizable interest in controlling the circumstances of his or
her imminent death" (Glucksberg, 521 US at 737-738 [O'Connor, J.
concurring]).  As plaintiffs and amici allege, and as medical
science indicates, palliative care is not always an option for a
terminally ill patient in severe pain approaching death.

live, only of how to die" (Glucksberg, 521 US at 746 [1997]

[Stevens, J. concurring]; see also Wilkinson v Skinner, 34 NY2d

53, 58 [1974] ["The requirements of due process are not static;

they vary with the elements of the ambience in which they

arise."]).  In such cases, patients have "a constitutionally

cognizable interest in obtaining relief from the suffering that

they may experience in the last days of their lives" that

outweighs the State's interest in essentially prolonging the

agony (Glucksberg, 521 US at 737).

Certainly, the State may "stay its hand" by doing

nothing to assist a terminally ill patient, thus letting the

dying process take its natural course (Fosmire, 75 NY2d at 227).

However, this is not the approach chosen by the State of New

York.  The reality is that the State already permits a patient to

choose medical measures that hasten death in ways that require

active, deliberate assistance of a physician.  These measures are

not passive.  For example, the State permits the turning off of

ventilators, the removal of breathing tubes, and the removal of

intravenous life-sustaining nourishment and medications, even

when the physician and patient know this will lead rapidly to

certain death.  As such, the State currently allows a physician,

with a patient or a guardian's informed consent, and in the

exercise of the physician's professional judgment, to

affirmatively assist in bringing about a terminally-ill patient's

death (see Pub Health Law §§ 2994-e [1]; 2994-f [1]).

These processes are widely considered appropriate and humane end-of-life treatments that recognize the dignity of the individual patient.  The justifications for allowing a physician to take active steps to precipitate a patient's death were powerfully noted in 2010, in the context of changes to the Public Health Law that now allows guardians of mentally-incompetent patients to withdraw or withhold life-sustaining treatments. Supporters of the bill wrote that,

> "[l]ost in the gaps of existing law, many families have witnessed what they knew to be the ardent desires of their incapacitated loved ones go unfulfilled for weeks and months, while every participant -- from the patient, to family members, to the professionals providing care -- has anguished. At the same time, families have been frozen by the lack of legal means to honor the deeply personal wishes of their loved ones" (Letter from Healthcare Association of New York State, Bill Jacket, 2010, AB 7729, ch 8).

The Assembly Memorandum in Support described the legislation as necessary because mentally-incompetent patients "may linger, through unnecessary medical intervention, in a state of irrevocable anguish," and "are, as a class, uniquely disqualified from health care rights essential to the humane and dignified treatment to which every other citizen is entitled" (2001 NY Assembly Bill A08466D).

Plaintiffs and amici Surviving Family Members similarly describe how terminally-ill patients, deprived of a legal path to bring about a death in line with their wishes, suffer

excruciatingly through the final moments of their lives as their loved ones and caregivers watch helplessly.  The complaint, plaintiffs' affidavits, and amici briefs are filled with accounts of patients who would have chosen aid-in-dying if the option were available.  One account describes an elderly man whose bones were so riddled with cancer they would spontaneously break, even when he was lying in bed without bearing weight.  Despite receiving opioids and other medications around the clock, he found his pain and suffering unbearable.  He wanted to know his options for a peaceful death and the only option the physician was able to offer was for him to voluntarily stop eating and drinking.  Another describes a man suffering from a degenerative motor neuron disease who, eight years after diagnosis, was wheelchair bound, had lost control of his bladder and bowels, as well as the ability to cough up food caught in his lungs, experienced his limbs atrophy, and "everything which he had previously identified as degrading about dying."  Ultimately he too chose to stop eating and drinking.  He remained conscious during the 12 days that followed until his death, at one point developing terminal agitation that caused "sudden uncontrollable fits of yelling and violent thrashing" that led to him being strapped to his bed.

The State argues a dichotomy between active and passive physician conduct differentiates aid-in-dying from other sanctioned end-of-life treatments.  This binary is unpersuasive in this context.  First, it does not conform with the experience

of all physicians (TE Quill, et al., <u>Palliative Options of Last Resort</u>, 278(23) JAMA 2099, 2102 [Dec 17, 1997] ["[T]here is nothing psychologically or physically passive about taking someone off a mechanical ventilator who is incapable of breathing on his or her own."]).  Second, the withdrawal of nourishment is anything but passive, as patients without an underlying disease die if they are prevented from eating and drinking.  Third, and in contrast, the physician's role in aid-in-dying is "passive" in a practical sense, for it is the patient who administers the lethal medication, often spatially and temporally distant from the moment the physician provided the prescription (<u>id.</u>). In some cases, the patient never ingests the dosage.[5]

Apart from the fact that the State permits these non-passive actions to hasten death for the terminally ill, the

---

[5] Not all physicians who prescribe a patient a lethal dosage necessarily know for certain that the patient will die from taking the prescription, as many patients prescribed these drugs do not ultimately take them. Many patients simply want to regain a modicum of control over the dying process (see <u>Glucksberg</u>, 521 US at 751 n 15 [Stevens, J. concurring]). The ranges vary from state to state.  In California, under the End of Life Option Act, 173 physicians prescribed 191 individuals lethal medication between June 9, 2016, and December 31, 2016.  Of the 191 prescribed patients, 111 (58.1%) were reported by their physician to have died following ingestion of lethal medication and 21 (11.0%) died without ingestion of the prescribed drugs.  The outcome of the remaining 59 (30.9%) individuals was undetermined at the time of the report (California Department of Public Health, <u>California End of Life Option Act 2016 Data Report</u> [2016] at 3, available at: https://www.cdph.ca.gov/Programs/CHSI/CDPH%20Document%20Library/CDPH%20End%20of%20Life%20Option%20Act%20Report.pdf [accessed August 29, 2017]).

State's interest in prohibiting aid-in-dying for this particular
sub-group of patients is further weakened by its sanctioning of
terminal sedation.  This end-of-life treatment consists of the
intravenous administration of sedatives and pain medication,
often coupled with the withholding of nutrition and hydration, to
a terminally-ill patient (J M van Delden, Terminal Sedation:
Source of a Restless Ethical Debate, 33(4) J Med Ethics 187, 187
[2007]).  In 2003, the American Medical Association issued a
policy statement supporting the practice, which it calls
"palliative sedation to unconsciousness," as "an intervention of
last resort to reduce severe, refractory pain or other
distressing clinical symptoms that do not respond to aggressive
symptom-specific palliation" (see The AMA Code of Medical Ethics'
Opinions on Sedation at the End of Life, 15(5) Virtual Mentor
428-429 [May 2013]).[6]

    For this sub-group of terminally ill patients, the
State recognizes this as a lawful means to end life.[7]  As in

_____

    [6] The statement recommends ethical guidelines for physicians
using the practice, such as only using it for patients in the
final stage of a terminal illness when their symptoms have been
unresponsive to aggressive treatment, and stresses that it is not
appropriate when the patient's suffering is primarily existential
(AMA Code at 429).  These guidelines are not dissimilar from
those codified in aid-in-dying statutes across the country (see
Or Rev Stat Ann §§ 127.800 - 127.897 [enacted in 1997]), and in
the bill currently before the legislature (Proposed Medical Aid
in Dying Act, NY Assembly Bill A02383 [Jan 19, 2017]).

    [7] Determining whether terminal sedation is appropriate is a
decision for physicians and patients (see AMA Code of Medical
Ethics' Opinions on Sedation at the End of Life at 428).

Glucksberg, the "parties and amici agree that . . . a patient who is suffering from a terminal illness and who is experiencing great pain has no legal barriers to obtaining medication, from qualified physicians, to alleviate that suffering, even to the point of causing unconsciousness and hastening death" (Glucksberg, 521 US at 736-37 [O'Connor, J. concurring]).  The difference between injecting a drug that sedates a patient while simultaneously quickening death and prescribing lethal medication is not meaningful in the constitutional sense.  Regardless of the method, the purpose of the physician's act and the patient's goal in both situations is to expedite the dying process and avoid the severe pain, suffering, and indignity associated with the last stage of a terminal illness.  In these cases, a patient's "interest in refusing medical care is incidental to [the patient's] more basic interest in controlling the manner and timing of her death" (Glucksberg, 521 US at 742 [1997] [Stevens, J. concurring]).  Moreover, by sanctioning a patient's right to refuse medical treatment, which leads to certain death, this Court has, like the United States Supreme Court, "in essence, authorized affirmative conduct that would hasten [a patient's] death" (id. at 743).

The State and my colleagues rely on an analysis of physician intent to differentiate aid-in-dying from terminal sedation and the withholding or withdrawal of life-saving treatment (per curiam at 10-11; J. Fahey concurring op at 4; J.

Garcia concurring op at 6).  The argument presumes that physicians who adopt aid-in-dying intend to cause the patient's death, while physicians who perform these other treatments intend solely to alleviate the patient's pain, and death is merely a potential unintended consequence.  My colleagues quote <u>Vacco v Quill</u> for the proposition that the law "has long used actors' intent or purpose to distinguish between two acts that may have the same result" (521 US 793, 802 [1997]; per curiam at 11; J. Fahey concurring op at 4; J. Garcia concurring op at 5).  This is irrelevant, because in every case involving individual liberty, the constitutional question turns on the nature and expanse of the patient's right to autonomy and bodily integrity as weighed against the State's interest, not the intent of a third party who assists the patient in receiving the proper medical treatment (<u>Rivers</u>, 67 NY2d at 498).[8]  Besides, we do not defer to federal analysis when we construe our broader state constitutional due process clause (<u>LaValle</u>, 3 NY3d at 127).

Moreover, this intent-based analysis fails even on its own terms.  Simply put, it is impossible, as a practical matter, to distinguish between these various end-of-life practices based

---

[8] Due to the conceptual murkiness of determining whether a physician's act is active or passive, and whether death is intended or merely foreseen by a physician, some experts on palliative care advise that considerations of "the patient's wishes and competent consent are more ethically important [than these concerns about the physicians's mindset]" (Quill, <u>Palliative Options of Last Resort</u>, at 2102).

on a third party's state of mind.  When a physician removes a patient from a life-sustaining apparatus, or declines to administer life-saving procedures, the physician's intent, in accord with the wishes of the patient, is to precipitate the death of the patient.  A physician who complies with a patient's constitutionally protected choice to forego life-sustaining treatment knows that when a ventilator is withdrawn, for example, the patient will soon die.[9]  To argue otherwise is to ignore the reality of the physician's actions and the patient's wishes.

Even the primary distinction cited by the State and my colleagues does not hold in all cases because, as the State concedes, the drugs involved in terminal sedation are known to cause a patient's death in certain cases.  A physician providing this medical option knows very well about the potential immediate consequence and must forewarn the patient (see AMA Code of Medical Ethics' Opinions on Sedation at the End of Life at 428).  Furthermore, while sedation may be necessary to alleviate a patient's pain, the withdrawal of nourishment, which forms part of the treatment, can only serve to bring about death (see David Orentlicher, The Supreme Court and Terminal Sedation: Rejecting Assisted Suicide, Embracing Euthanasia, 24 Hastings Const L Q

---

[9] Arguably, at least as long as the patient remains conscious, it may be possible for a patient who has asked for a ventilator or nourishment to be withdrawn to change course and decide to resume life-sustaining treatment.  Terminal sedation, however, initiates a process whereby the patient cannot object once sedated and inevitably ends in the patient's death.

947, 957 [Summer 1997]). Resolution of the constitutional question requires consideration of the patient's rights; not a speculative exploration of the physician's intent.

Terminal sedation is intended to initiate what must be described for what it is:  a slow-acting lethal process.  While it may fall under the umbrella of palliative care (see Glucksberg, 521 US at 737-738 [O'Connor, J. concurring]), terminal sedation is not solely a method of pain management but is instead a procedure that hastens the inevitable death of the patient.  It places the patient in a condition where choosing to struggle against death is no longer possible.  It facilitates the patient's choice to end life.

If terminally-ill patients may exercise their liberty interest by choosing to be terminally sedated, the State has no compelling rationale, or even a rational interest, in refusing a mentally-competent, terminally-ill patient who is in the final stage of life the choice of a less intrusive option -- access to aid-in-dying -- which may better comport with the patient's autonomy and dignity.  It is also an option which lessens the time patients and their families are forced to wait for the inevitable -- often by no more than days and possibly much less.

IV.

Concerns about allowing aid-in-dying for the sub-group I have identified are misplaced.  Consider, first, the State's

interest in preserving life.  Admittedly, the State has compelling interests that justify prohibiting assisted suicide as a general matter, but those interests are diminished and do not outweigh the individual's liberty interest in the case of a competent terminally-ill patient in the final stage of life, with no cure or recourse other than inadequate pain management, facing a death the patient feels is bereft of dignity.  As the State's own policies regarding terminal sedation attest, it has accepted that its interest in preserving life should cede to the rights of a patient in this condition.  Acknowledgment of the individual's right to decide when and how to end life in the limited situations I have discussed does not undermine the sacredness of life or devalue the patient any more than terminal sedation does.  Instead, by honoring a patient's wishes, the State recognizes the individual's right to full autonomy and to make a choice that reflects deeply held beliefs about life and death.

Nor does the State's general interest in preventing suicide and avoiding misdiagnosis outweigh the liberty interests in aid-in dying for mentally-competent, terminally-ill patients facing imminent, agonizing death.  The State's interests for this group of patients are not comparable to cases involving persons without terminal illnesses who are able to manage their illness and its debilitating effects, or those who for any number of personal reasons do not want to hasten death with a lethal prescription.  There is no possibility of an erroneous terminal

diagnosis for these patients as aid-in-dying would only be available in the last stage of life, when the end is imminent and certain. The fear that allowing aid-in-dying will result in patient coercion or be the first step to government-sanctioned euthanasia is as misplaced as the notion that terminal sedation inevitably leads to government-sanctioned euthanasia.[10] Permitting these patients to choose whether to experience the short time that remains under conditions some may find unbearable is a recognition of the importance of individual autonomy and the limits of the State's ability to interfere with a patient's most intimate personal decisions (Rivers, 67 NY2d at 492-493; Obergefell, 135 S Ct at 2597).

The State's argument that aid-in-dying would make it

---

[10] The prediction that sanctioning aid-in-dying would put New York State on a slippery slope toward legalizing non-voluntary euthanasia is far from certain. Studies of two decades of euthanasia in the Netherlands "show no evidence of a slippery slope [leading to non-voluntary euthanasia]. . . . Also, there is no evidence for a higher frequency of euthanasia among the elderly, people with low educational status, the poor, the physically disabled or chronically ill, minors, people with psychiatric illnesses including depression, or racial or ethnic minorities, compared with background populations" (JA Rietjens, et al., Two Decades of Research on Euthanasia from the Netherlands. What Have We Learnt and What Questions Remain?, 6(3) J Bioeth Inq 271 [2009], at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2733179/ [accessed August 29, 2017]; see also MP Battin, et al., Legal physician-assisted dying in Oregon and the Netherlands: evidence concerning the impact on patients in "vulnerable" groups, 33(10) J Med Ethics 591 [2007]). This finding is mirrored in the data from Oregon, which shows no evidence of heightened risk in any of the above categories (id.).

more difficult to ensure adequate medical treatment for those
with untreated pain and depression is a valid interest in support
of the State's prohibition on physician-assisted suicide as a
general matter.  However, it does not outweigh the interests of
the terminally ill for whom pain treatment is inadequate and
whose choice is not motivated by depression and helplessness, but
by the desire to exercise autonomy to achieve a peaceful death,
one that honors individuality and dignity (see Glucksberg, 521 US
at 746-74 [1997] [Stevens, J. concurring]).  Nor can it be said
to be rational when the State already permits terminal sedation.

The State's other argument, that aid-in-dying
undermines the integrity and ethics of the medical profession as
it is incompatible with the physician's role as a healer,[11] is
not uniformly accepted and is contradicted by the experiences of
some medical professionals.[12]  The plaintiff-

---

[11] The State does not adopt Judge Garcia's argument that the
opinion of some medical professionals alone is enough for this
statute to survive rational basis scrutiny as applied to this
sub-group (J. Garcia concurring op at 15).  And with good reason:
such a low threshold risks rendering our rational basis test
meaningless.

[12] For example, the New York State Academy of Family
Physicians, representing over six thousand physicians and medical
students, recently decided to support aid-in-dying ("Physician's
group endorses medical aid-in-dying legislation," The Legislative
Gazette [June 25, 2017], available at:
http://legislativegazette.com/physicians-group-endorses-medical-a
id-in-dying/ [accessed August 29, 2017]).  Also, this year the
Medical Society of the State of New York decided to conduct a
survey of physicians in the State to determine their attitudes
towards aid-in-dying, citing public support and changes in the

physicians who treat the terminally ill and amici representing

the American Medical Student Association, American Medical

Women's Association, and American College of Legal Medicine,

describe how inhibiting a physician's exercise of best

professional judgment when counseling a patient about end-of-life

choices undermines the doctor-patient relationship.  Indeed, aid-

in-dying is openly practiced in various parts of the country

without having compromised the profession.[13]  Several amici point

out that in those states where aid-in-dying is lawful -- Oregon,

Washington, Vermont and California[14] -- the physician standard of

care is governed by statutes and professional guidelines that

law elsewhere (see "New York's medical society will survey
doctors on attitudes towards physician assisted dying," WXXI News
[April 24, 2017], available at:
http://wxxinews.org/post/new-york-s-medical-society-will-survey-d
octors-attitudes-toward-physician-assisted-dying [accessed August
29, 2017]).  This included a survey commissioned by Compassion &
Choices, a non-profit organization focusing on end-of-life care,
which indicates that 77 percent of New Yorkers support access to
aid-in-dying (Compassion & Choices, New York 2015-16 Research
Report, available at:
https://www.compassionandchoices.org/wp-content/uploads/2017/02/2
NY-POLL-INFO.pdf [accessed August 29, 2017]).

[13] Notably, a 2003 survey of doctors and nurses published by
the Journal of the American Medical Association indicated that
aid-in-dying was being practiced clandestinely throughout the
country (see Diane E. Meier, MD et al, Characteristics of
Patients Requesting and Receiving Physician-Assisted Death,
163(13) Arch Intern Med 1537 [2003], available at:
https://jamanetwork.com/journals/jamainternalmedicine/fullarticle
/215798 [accessed August 29, 2017]).

[14] Colorado has recently adopted a ballot measure permitting
aid-in-dying (Colo End of Life Options Act, Prop 106 [2016]).

have ensured the quality and careful application of this end of life treatment.[15]  By all measures, the State fails to address that the "time-honored line between healing and harming" does not provide much guidance for practices like terminal sedation or aid-in-dying (Glucksberg, 521 US at 731 [citations and quotation

---

[15] The decisions from other states cited by the Court to demonstrate that assisted suicide has nowhere yet been deemed a fundamental right by a high court in the United States do not affect the analysis, as plaintiffs rely on the guarantees afforded by the New York State Constitution and our Court's broad interpretation of the state Due Process Clause.  To the extent some of the cases cited by the per curiam analyze their own state constitutions in a manner similar to that employed by the per curiam here (per curiam at 13-14), I note that not all are based on their respective state's due process clause (see People v Kevorkian, 447 Mich 436, 538, 527 NW2d 714, 758 [Mich 1994]).  Further, the analysis is not uniform across these cases.  For example, in Morris v Brandenburg (2016-NMSC-027, 376 P3d 836, 841 [NM 2016]), the most recent case cited by the per curiam, the Supreme Court of New Mexico reversed the trial court, which had found a statute that prohibited aid-in-dying violated the New Mexico State Constitution's guarantee to protect life, liberty, and happiness.  However, in that case, the State conceded that it did not "have an interest in preserving a painful and debilitating life that will end imminently."  The court found that the State had, instead, a legitimate interest in providing protections to ensure that decisions regarding aid-in-dying are informed, independent, and procedurally safe (id. at 855).  The court ultimately determined that the right to aid-in-dying is best defined by the legislature, which is better equipped to develop appropriate safeguards than the judiciary (points also made by the courts in the Florida and Alaska cases [Krischer v McIver, 697 So 2d 97, 104 (Fla 1997); Sampson v State of Alaska, 31 P3d 88,98 (Alaska 2001)]).  A dissenting judge in the Michigan case also argued that the State's interest in the preservation of life dwindles as a terminally-ill patient suffering great pain seeks to hasten death through physician-prescribed medications (Kevorkian, 447 Mich at 538 [Mallett, J., dissenting]).  Thus, to the extent these cases may be instructive, they reveal that the constitutional analysis of aid-in-dying is specific to each state's constitutional jurisprudence and interests.

marks omitted]).  For this sub-group of patients, healing, as understood as a restoration of bodily health, is no longer a possibility.

In addition to the interests asserted by the State, my colleagues "hypothesize" an additional concern in avoiding misuse of a patient's dosage (per curiam at 11-12).  Yet, the risk of the drugs involved in aid-in-dying being "deliberately or accidentally misused" is no more than with any other drug with the potential to cause severe injury or death that a physician may legally prescribe (see Office of the New York State Comptroller, Prescription Opioid Abuse and Heroin Addiction in New York State [June 2016], available at https://www.osc.state.ny.us/press/releases/june16/heroin_and_opio ids.pdf [accessed August 29, 2017]).  At most, this simply shows that the State may regulate this area, as other states have done.[16]

V.

"It is the province of the Judicial branch to define, and safeguard, rights provided by the New York State Constitution, and order redress for violation of them" (Campaign

---

[16] Although the State's authority to regulate the exercise of a terminally-ill patient's access to aid-in-dying medications is not directly presented in this appeal, some regulation of this medical treatment option would fall within the State's power over public health matters (see Viemeister v White, 179 NY 235, 238 [1904]).

for Fiscal Equity, Inc. v State, 100 NY2d 893, 925 [2003]).
Although a liberty interest is at stake here, the Court implies
and Judge Garcia argues that this question is best addressed by
the Legislature (per curiam at 13; J. Garcia concurring op at
17).  "The Court, however, plays a crucial and necessary function
in our system of checks and balances.  It is the responsibility
of the judiciary to safeguard the rights afforded under our State
Constitution" (People v LaValle, 3 NY3d 88, 128 [2004]).  We may
not abdicate that role to any other branch of government
(Campaign for Fiscal Equity, 100 NY2d at 925).

Mentally-competent, terminally-ill patients, with no
cure or recourse other than inadequate pain management or
palliative sedation to unconsciousness, and who face certain,
imminent, excruciating death, are situated quantitatively and
qualitatively differently from other individuals, even others
living with terminal illnesses.  State interests that animate the
prohibition on physician aid-in-dying for these patients are
diminished as death draws near and ultimately are outweighed by
these patients' liberty interest and extant rights to self-
determination and bodily integrity.  The compelling state
interests that bar physician assisted suicide in general are not,
for this group, dispositive.  When the State already permits
physicians to instigate other processes that precipitate death,
there is no compelling basis for depriving such patients of an
option that can better comport with their sense of dignity,

control, and independence.  Our State Constitution protects the rights of these terminally-ill patients to make the deeply personal choice of how they define and experience their final moments.

Sara Myers v Schneiderman

No. 77


FAHEY, J. (concurring):

Experience teaches us that arguably benign policies can lead to unanticipated results. I write separately to expand on certain risks that would be associated with legalizing physician-assisted suicide in New York and that justify its prohibition.

I.

Several significant rationales exist for criminalizing physician-assisted suicide, each of which would constitute a legitimate legislative purpose for the statute challenged here. The per curiam opinion, which I join, outlines many of these legitimate government interests (see per curiam op at 12; see also Washington v Glucksberg, 521 US 702, 728-735 [1997] [holding that Washington State's then-ban on assisted suicide did not violate substantive due process under the Fourteenth Amendment of the Federal Constitution]).

I focus on two, closely related rationales. First, the Legislature may reasonably criminalize assisted suicide because to permit the practice would open the door to voluntary and non-voluntary euthanasia. To use the familiar metaphor, it would place New York on a slippery slope toward legalizing non-voluntary euthanasia. Second, the Legislature may reasonably

- 1 -

criminalize physician-assisted suicide because a right to assisted suicide by the terminally ill in circumscribed last-resort situations would inevitably expand to include persons who are not terminally ill.

I begin by discussing matters of terminology in regard to physician-assisted dying and the legal landscape in the United States. Physician-assisted suicide, the topic of this appeal, differs conceptually from euthanasia. In euthanasia, a physician brings about the death of a patient, whereas, in physician-assisted suicide, it is the patient who kills himself or herself, with the assistance of a physician. The common thread, more significant than the conceptual difference, is the use of a lethal dosage of medication intended to end the patient's life.

In the United States, physician-assisted suicide has been legalized and is regulated in Oregon (see Or Rev Stat Ann §§ 127.800 - 127.897 [enacted in 1997]); Washington (see Wash Rev Code §§ 70.245.010 - 70.245.904 [enacted in 2008]); Vermont (see 18 Vt Stat Ann ch 113 [enacted in 2013]); California (see End of Life Option Act, Cal. Health & Safety Code pt 1.85 [enacted in 2015]); Colorado (see Rev Stat §§ 25-48-101 - 25-48-123 [enacted in 2016]); and the District of Columbia (see D.C. Act 21-577 [enacted in 2016]). Each of these jurisdictions expressly permits physician-assisted suicide by statute,[1] and in each one

_____

[1]    In Montana, a terminally ill patient's consent to physician-assisted suicide constitutes a defense to a charge of homicide under a state criminal statute, as interpreted by the

physician-assisted suicide is limited to mentally competent patients, 18 years of age or older, who have been diagnosed with a terminal illness that will lead to death within six months.

By contrast, euthanasia is legal in no jurisdiction in the United States.  Here, "euthanasia" refers to active euthanasia, i.e., the intentional killing of a patient, motivated by the physician's concern for the patient's suffering or "indignity."  This concept of euthanasia does not include practices -- sometimes referred to as passive euthanasia but more often not described as euthanasia at all -- in which a physician lets a patient die (see generally James Rachels, Active and Passive Euthanasia, 292 New England Journal of Medicine 78 [1975]; Thomas D. Sullivan, Active and Passive Euthanasia: An Impertinent Distinction?, 3 Human Life Review 40 [1977], both reprinted in Bonnie Steinbock, Alastair Norcross, Killing and Letting Die 112-119, 131-138 [1994]; Daniel Callahan, Killing and Allowing to Die, 19 Hastings Center Report, Special Supplement 5 [1989], reprinted in Michael Boylan, Medical Ethics 199-202 [2000]; L.W. Sumner, Assisted Death: A Study in Ethics and Law 19 & n 46 [2011]).  Such essentially passive physician practices, now generally considered unobjectionable in proper circumstances, include, for example, removing a patient from a machine that would prolong the patient's life or withdrawing nutrition and

---

Montana Supreme Court (see Baxter v State, 224 P3d 1211, 1222 [Mont 2009]).

hydration from a patient undergoing palliative sedation.

I respectfully disagree with Judge Rivera's view that the difference between palliative sedation and physician-assisted suicide "is not meaningful in the constitutional sense" (concurring op of Rivera, J., at 17).  Instead, I would follow the Supreme Court's analysis in Vacco v Quill (521 US 793 [1997]).

> "[A] physician who withdraws, or honors a patient's refusal to begin, life-sustaining medical treatment purposefully intends, or may so intend, only to respect his patient's wishes and to cease doing useless and futile or degrading things to the patient when the patient no longer stands to benefit from them.  The same is true when a doctor provides aggressive palliative care; in some cases, painkilling drugs may hasten a patient's death, but the physician's purpose and intent is, or may be, only to ease his patient's pain.  A doctor who assists a suicide, however, must, necessarily and indubitably, intend primarily that the patient be made dead.  Similarly, a patient who commits suicide with a doctor's aid necessarily has the specific intent to end his or her own life, while a patient who refuses or discontinues treatment might not.
>     "The law has long used actors' intent or purpose to distinguish between two acts that may have the same result.  Put differently, the law distinguishes actions taken 'because of' a given end from actions taken 'in spite of' their unintended but foreseen consequences"  (id. at 801-803 [internal quotation marks, square brackets, and citations omitted]; see also id. at 808 n 11).[2]

---

[2]     See generally Sullivan, Active and Passive Euthanasia: An Impertinent Distinction?, in Steinbock and Norcross at 136; R.G. Frey, Intention, Foresight, and Killing, in Tom L.

Finally, there is an important distinction between voluntary and non-voluntary euthanasia. Voluntary euthanasia is euthanasia in accordance with the request of a mentally competent patient. Non-voluntary euthanasia is euthanasia performed on someone who, because of a factor such as infancy, mental incompetence, coma, etc., is not able to choose euthanasia and has never recorded a directive expressing his or her will in regard to euthanasia. Involuntary euthanasia, not implicated here, would be euthanasia performed on a person who is able to give consent, but has not done so, either because the person was not asked or because he or she withheld consent (see generally L.W. Sumner, Assisted Death: A Study in Ethics and Law at 17).

## II.

The practice of physician-assisted suicide and euthanasia in the Netherlands provides us with a disturbing preview of what it would be rational to expect upon legalization. In what follows, I concentrate on that country, which has the longest history of socially accepted euthanasia, while adding comments on other jurisdictions that have legalized euthanasia or physician-assisted suicide. It will be clear from the foregoing section that the practices to be discussed below are euthanasia

---

Beauchamp, Intending Death: The Ethics of Suicide and Euthanasia 69-70 (1996); Greg Beabout, Morphine Use for Terminal Cancer Patients: An Application of the Principle of Double Effect, 19 Philosophy in Context 49 (1989), reprinted in P.A. Woodward, The Doctrine of Double Effect 298-311 (2001).

and physician-assisted suicide, not palliative sedation or removal of a patient from life support or other treatment.

In the Netherlands in 2002, the Termination of Life on Request and Assisted Suicide (Review Procedures) Act was enacted to legalize and regulate long-standing pre-existing practices of physician-assisted suicide and voluntary euthanasia.  Under that statute, a physician may end the life of a patient who is experiencing unbearable suffering without hope of relief, at the patient's explicit request, either by administering a lethal dosage of medication (euthanasia) or by prescribing a pharmaceutical means of suicide (physician-assisted suicide) (see generally Government of the Netherlands, Is euthanasia allowed?, at https://www.government.nl/topics/euthanasia/contents/is-euthanasia-allowed [accessed August 21, 2017]).

In 2015, euthanasia and physician-assisted suicide accounted for 5,516 reported deaths in the Netherlands, almost four percent of all deaths in the country, estimated at around 140,000 per annum (see Regional Euthanasia Review Committees, Annual Report 2015, at 16, available at https://english. euthanasiecommissie.nl/documents/publications/annual-reports/2002 /annual-reports/annual-reports [accessed August 21, 2017]).  The proportion of deaths attributed to euthanasia and physician-assisted suicide had more than doubled over ten years (see Regional Euthanasia Review Committees, Annual Report 2005, at 2, available at https://english.euthanasiecommissie.nl/documents/

publications/annual-reports/2002/annual-reports/annual-reports
[accessed August 21, 2017] [1,933 cases of euthanasia and
assisted suicide were reported in 2005]).

The most immediately striking aspect of end-of-life
decision-making in the Netherlands is that no legal or ethical
distinction is drawn between physician-assisted suicide and
euthanasia.  Similarly, physician-assisted suicide and euthanasia
were made legal at the same time as one another in both Belgium
(2002) and Luxembourg (2009).  In Canada, a 2015 Supreme Court of
Canada decision striking down a prohibition on assisted suicide
led to a June 2016 law legalizing both "the prescribing or
providing by a medical practitioner or nurse practitioner of a
substance to a person, at their request, so that they may
self-administer the substance and in doing so cause their own
death" (physician-assisted suicide) and "the administering by a
medical practitioner or nurse practitioner of a substance to a
person, at their request, that causes their death" (euthanasia)
(Statutes of Canada 2016, Bill C-14, An Act to amend the Criminal
Code and to make related amendments to other Acts [medical
assistance in dying], available at http://www.parl.ca/Document
Viewer/en/42-1/bill/C-14/royal-assent [accessed August 21, 2017];
see also https://openparliament.ca/bills/42-1/C-14 [accessed
August 21, 2017]).  The movement from allowing physician-assisted
suicide to permitting euthanasia is facile; indeed, it apparently
has not even been perceived as a transition in some societies

outside the United States that have legalized the former practice.

It is true, as I have already noted, that in the United States active euthanasia is nowhere legal, whereas physician-assisted suicide is permitted in six states and the District of Columbia.  I am not convinced, however, that this state of affairs will last.  The evidence from the Netherlands, Belgium, Luxembourg, and Canada suggests it will not.  Moreover, the line between physician-assisted suicide and euthanasia is difficult to defend.  If a person has the statutory or other right to physician-assisted suicide, does she lose the right to die if she suddenly becomes too physically weak to self-administer lethal prescribed drugs?  "[T]his would arguably amount to discrimination based upon physical disability" (Sampson v State, 31 P3d 88, 97 [Alaska 2001] [upholding as constitutional a criminal statute prohibiting intentionally aiding another person to commit suicide]; see also e.g. Dan W. Brock, Voluntary Active Euthanasia, 22 Hastings Center Report 10, 10 [1992]).  In practice, it appears that in Oregon a feeding tube is sometimes used to enable a patient who wishes to commit suicide using prescription medication, but has lost mobility, to ingest the lethal prescription (see Disability Rights Education & Defense Fund, Some Oregon and Washington State Assisted Suicide Abuses and Complications, Self-Administration, at https://lozier institute.org/a-reality-check-on-assisted-suicide-in-oregon

[accessed August 21, 2017]).

Indeed, this concern about the transition from physician-assisted suicide to euthanasia was recognized by the United States Supreme Court, which observed that "in some instances, the patient may be unable to self-administer the drugs and . . . administration by the physician . . . may be the only way the patient may be able to receive them," and that "not only physicians, but also family members and loved ones, will inevitably participate in assisting suicide.  Thus, it turns out that what is couched as a limited right to 'physician-assisted suicide' is likely, in effect, a much broader license, which could prove extremely difficult to police and contain" (Glucksberg, 521 US at 733 [internal quotation marks and citations omitted]).  Justice Souter expanded on the point, noting that "[p]hysicians, and their hospitals, have their own financial incentives, too, in this new age of managed care. Whether acting from compassion or under some other influence, a physician who would provide a drug for a patient to administer might well go the further step of administering the drug himself; so, the barrier between assisted suicide and euthanasia could become porous" (Glucksberg, 521 US at 784-785 [Souter, J., concurring]).

Based on the current experience in the Netherlands, an expansion from physician-assisted suicide, by a patient taking a prescription of fatal drugs, to euthanasia, by a nurse or

physician administering a prescription of fatal drugs, seems all
but inevitable.  Certainly the fear of that expansion, if
physician-assisted suicide were legalized in New York, is
reasonable.

III.

The Netherlands has displayed another very disturbing
trend: the countenancing of both voluntary euthanasia and non-
voluntary euthanasia.  A study conducted in 2005 revealed that
2410 people in the Netherlands, 1.8% of all deaths in the
Netherlands that year, died as a result of voluntary euthanasia
or physician-assisted suicide,[3] while 0.4% of all deaths, or some
560 people, died as "the result of the use of lethal drugs not at
the explicit request of the patient" (A. van der Heide et al.,
End-of-life practices in the Netherlands under the Euthanasia
Act, 356 N Engl J Med 1957 [Table 1] [2007] [emphasis added],
available at http://www.nejm.org/doi/full/10.1056/NEJMsa071143
#t=articleTop [accessed August 21, 2017]; see also J. Pereira,
Legalizing euthanasia or assisted suicide: the illusion of
safeguards and controls, 18 Curr Oncol e38 [2011], available at

---

[3]     This figure includes 1,933 reported cases and 477
unreported cases.  The study classified actions as euthanasia or
physician-assisted suicide if the physician administered,
supplied, or prescribed drugs with the explicit intention of
hastening death, and at the explicit request of the patient,
resulting in the patient's death.  Not classified as instances of
euthanasia or physician-assisted suicide were situations in which
medical treatment was withheld or withdrawn, or measures to
alleviate pain or other symptoms (such as palliative sedation)
were intensified.

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3070710 [accessed August 21, 2017]).  In other words, for every five people who died in the Netherlands as a result of euthanasia or physician-assisted suicide in the immediate wake of the legalization and regulation of the practices, one died without explicitly requesting death and thus in violation of the law.  Such cases involved, for example, patients who were "unconscious . . . or incompetent owing to young age" (A. van der Heide et al., End-of-life practices in the Netherlands under the Euthanasia Act), and it was more common for the euthanasia to be justified by discussion with the patient's relatives than by past discussion with the patient (see id.).

A similar study of euthanasia and physician-assisted suicide in Belgium revealed a large proportion of patients who received euthanasia without an explicit request, some 32% of those who received euthanasia (see K. Chambaere et al., Physician-assisted deaths under the euthanasia law in Belgium: a population-based survey, 182 Canadian Medical Association Journal 895, 896, 897 [Table 1] [2010], available at http://www.cmaj.ca/content/182/9/895 [accessed August 21, 2017]).  Typically, in Belgian cases of non-voluntary euthanasia, the patient is in a coma or suffering from dementia, and relatives or other caregivers are consulted in advance regarding the euthanasia (see id. at 898-899).

In studying the modern experience in the Benelux

nations, we are, of course, not facing government-sanctioned forced euthanasia. The decision-makers in non-voluntary euthanasia may be well-meaning. Such consultation, however, does not render the euthanasia voluntary, and indeed brings to mind the necessity of ensuring that decision-making about ending the lives of vulnerable, terminally ill people is <u>not</u> entrusted entirely to those who have the financial and emotional burden of caring for them.

I am not suggesting that the legalization of voluntary euthanasia, in a society such as the Netherlands in which it was already widely practiced, necessarily increases the rate of non-voluntary euthanasia. It may not invariably do so (<u>see</u> A. van der Heide et al., <u>End-of-life practices in the Netherlands under the Euthanasia Act</u>). My point is simply that physician-assisted suicide and euthanasia are inevitably accompanied by instances of non-voluntary euthanasia, so that it is rational to predict that endorsement of physician-assisted suicide will lead to occurrences of non-voluntary euthanasia.

There is also a reasonable concern that a descent from voluntary euthanasia and physician-assisted suicide to non-voluntary euthanasia would be an especial risk in vulnerable and disadvantaged parts of society. In 1994, the New York State Task Force on Life and the Law "unanimously recommend[ed] that New York laws prohibiting assisted suicide and euthanasia should not be changed" (New York State Task Force on Life and the Law, <u>When</u>

Death Is Sought: Assisted Suicide and Euthanasia in the Medical

Context [May 1994], Executive Summary, available at https://www.

health.ny.gov/regulations/task_force/reports_publications/when_

death_is_sought [accessed August 21, 2017]).[4]  The Task Force

reasoned that "legalizing assisted suicide and euthanasia would

pose profound risks to many individuals who are ill and

vulnerable. . . . The risk of harm is greatest for the many

individuals in our society whose autonomy and well-being are

already compromised by poverty, lack of access to good medical

care, advanced age, or membership in a stigmatized social group"

(New York State Task Force, When Death Is Sought at 120,

available at https://www.health.ny.gov/regulations/task_force/

reports_publications/when_death_is_sought/chap6.htm [accessed

August 21, 2017]).  As the Task Force observed, "[n]o matter how

carefully any guidelines are framed, assisted suicide and

euthanasia will be practiced through the prism of social

inequality and bias that characterizes the delivery of services

in all segments of our society, including health care.  The

practices will pose the greatest risks to those who are poor,

elderly, members of a minority group, or without access to good

medical care" (New York State Task Force, When Death Is Sought,

---

[4]      In 1985, the New York State Task Force on Life and the
Law was established by Governor Mario Cuomo, commissioned with "a
broad mandate to recommend public policy on issues raised by
medical advances" (https://www.health.ny.gov/regulations/task_
force/reports_publications/when_death_is_sought/preface.htm
[accessed August 21, 2017]).

Executive Summary, available at https://www.health.ny.gov/
regulations/task_force/reports_publications/when_death_is_sought/
preface.htm [accessed August 21, 2017]).

Given an acceptance of physician-assisted suicide and
voluntary euthanasia, such practices could come over time to be
regarded as cheaper alternatives to medical treatment for the
terminally ill, leading to a particular risk of non-voluntary
euthanasia when a patient's socioeconomic disadvantages,
uninsured status, and/or dementia or mental incompetence make it
impossible for the patient to advocate vigorously for his or her
health care.  "Frail and debilitated elderly people, often
demented or otherwise incompetent and thereby unable to defend
and assert their own interests, may be especially vulnerable to
unwanted euthanasia" (Brock, Voluntary Active Euthanasia, 22
Hastings Center Report at 21).

It is true that research from Oregon suggests that such
fears of non-voluntary euthanasia of the vulnerable have not yet
come to pass.  "[R]ates of assisted dying in Oregon . . . showed
no evidence of heightened risk for the elderly, women, the
uninsured . . ., people with low educational status, the poor,
the physically disabled or chronically ill, minors, people with
psychiatric illnesses including depression, or racial or ethnic
minorities, compared with background populations" (Margaret P.
Battin, et al., Legal physician-assisted dying in Oregon and the
Netherlands: evidence concerning the impact on patients in

"vulnerable" groups, 33 J Med Ethics 591 [2007], available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2652799 [accessed August 21, 2017]).  Yet the experiment with physician-assisted suicide on the West Coast is still young, and the Dutch experience supports the rationality of such fears.

A disability does not deprive life of integrity or

Another part of society that could be at significant long-term risk is the community of people who are disabled.  The Disability Rights amici argue that while the plaintiffs "use the term 'dignified death' to justify assisted suicide. . . . the 'indignities' nondisabled (and some newly disabled) people invariably describe are the need for assistance in daily activities like bathing, dressing, and other realities of having a disability.  Legalizing assisted suicide enshrines in law the prejudice that death is preferable to receiving the assistance that many disabled people rely on" (Amicus Brief of Disability Rights Amici: Not Dead Yet et al., at 4).  For the many members of the disabled community who are not terminally ill, the "indignities" that plaintiffs wish to avoid are suffered on a daily basis.  Legalizing physician-assisted suicide would convey a societal value judgment that such "indignities" as physical vulnerability and dependence mean that life no longer has any intrinsic value.

A disability does not deprive life of integrity or value.  There is no lack of nobility or true dignity in being dependent on others.  The natural developments of old age and

final illness are dependence and waning consciousness.  Many disabilities come with similar challenges.  It would be a profound mistake to equate limits imposed on a person's life with the conclusion that such a life has no value.

                                 IV.

        Last year, the American Psychiatric Association (APA) stated its official policy on physician-assisted suicide or euthanasia of psychiatric patients: "a psychiatrist should not prescribe or administer any intervention to a non-terminally ill person for the purpose of causing death" (APA, Position Statement on Medical Euthanasia [December 2016], available at https://www.psychiatry.org/home/policy-finder [accessed August 21, 2017]).  At the time, a member of the APA's ethics committee stated that he feared that Canada and the jurisdictions in the United States that have legalized physician-assisted suicide are headed in the same direction as the Netherlands and Belgium.  "So far, no other country that has implemented physician-assisted suicide has been able to constrain its application solely to the terminally ill, eventually including non-terminal patients as legally eligible as well . . .  This is when psychiatric patients start to be included" (Michael Cook, <u>American Psychiatric Association takes historic stand on assisted suicide and euthanasia</u>, BioEdge: bioethics news from around the world, December 16, 2016, available at https://www.bioedge.org/bioethics/american-psychiatric-association-takes-historic-stand-on-assisted-suicide-

a/12137 [accessed August 21, 2017]).

The experience of euthanasia in the Netherlands amply justifies this assertion.  Euthanasia and physician-assisted suicide in the Netherlands have not been limited to those whose pain is physical.  As long as "the patient's suffering is unbearable and without prospect of improvement" (Government of the Netherlands, Is euthanasia allowed?), a person whose illness is psychiatric may request and receive euthanasia or commit physician-assisted suicide.  For example, in 2013, a woman in her thirties suffering from obsessive-compulsive disorder and an eating disorder, who engaged in "prolonged and extensive eating and vomiting rituals," was considered a suitable candidate for euthanasia because she "had tried every conceivable psychotherapy and drug treatment" without success and "experienced her suffering as unbearable" (id. at 24).  In 2013, there were 42 reported cases of euthanasia and physician-assisted suicide of people with psychiatric, rather than physical, conditions, as compared with 14 in 2012 and 13 in 2011 (see Regional Euthanasia Review Committees, Annual Report 2013, at 9, available at https://english.euthanasiecommissie.nl/documents/publications/ annual-reports/2002/annual-reports/annual-reports [accessed August 21, 2017]).  By 2015, the number of persons with psychiatric suffering who received euthanasia in the Netherlands was 56 (see Regional Euthanasia Review Committees, Annual Report 2015, at 6, available at https://english.euthanasiecommissie.nl/

documents/publications/annual-reports/2002/annual-reports/annual-reports [accessed August 21, 2017]).

A 2016 survey of the euthanasia and physician-assisted suicide of 66 patients with psychiatric suffering in the Netherlands from 2011 to 2014 found that in most cases the patient's primary psychiatric condition was a depressive disorder (S.Y.H. Kim et al., <u>Euthanasia and Assisted Suicide of Patients with Psychiatric Disorders in the Netherlands 2011 to 2014</u>, 73 JAMA Psychiatry 362 [2016], available at http://jamanetwork.com/journals/jamapsychiatry/fullarticle/2491354 [accessed August 21, 2017], at E3), ranging from "patients with chronic, severe, difficult-to-treat depressions" to a woman who had lost her husband and found life as a widow "meaningless" but "did not feel depressed at all" and "ate, drank, and slept well . . . followed the news and undertook activities" (<u>id.</u> at E3).

The same survey noted that most of the patients felt "social isolation or loneliness," including one who believed "that she had had a life without love and therefore had no right to exist" and "an utterly lonely man whose life had been a failure" (<u>id.</u> at E4). The authors of the survey concluded that the patients receiving euthanasia or physician-assisted suicide "are mostly women . . . with various chronic psychiatric conditions, accompanied by personality disorders, significant physical problems, and social isolation or loneliness" (<u>id.</u> at E6). It is evident that the practice of physician-assisted

suicide and euthanasia in the Netherlands has already descended to the level of condoning the suicide or killing of people whose primary suffering is not physical pain, but chronic depression.

Recently, the Netherlands has shown signs of taking a new path down the slope that began with physician-assisted suicide and euthanasia of the terminally ill.  In 2016, the Health Minister defended a proposed law allowing healthy older people to seek euthanasia if they feel that they "do not have the possibility to continue life in a meaningful way, . . . are struggling with the loss of independence and reduced mobility, . . . have a sense of loneliness, partly because of the loss of loved ones, and . . . are burdened by general fatigue, deterioration and loss of personal dignity" (Dan Bilefsky, Christopher F. Schuetze, Dutch Law Would Allow Assisted Suicide for Healthy Older People, New York Times, Oct 14, 2016 at A5, available at https://www.nytimes.com/2016/10/14/world/europe/dutch-law-would-allow-euthanasia-for-healthy-elderly-people.html?_r=0 [accessed August 21, 2017]).  The proposed law essentially would allow people who are tired of life to end their lives.

Notably, the authors of the 2016 survey observe that the requirement that there be no "prospect of improvement" has proved controversial when the people seeking euthanasia are psychiatric patients.  The survey authors found that almost one-third of the patients had initially been refused euthanasia or physician-assisted suicide and that almost one-quarter of the

cases "engendered <u>disagreements among the physicians involved</u>" (<u>id.</u> at E6 [emphasis added]).  They noted "the . . . complicated determinations of medical futility that must incorporate patients' treatment refusals in the context of less-than-certain prognosis even among persons with treatment-resistant depression" (<u>id.</u>).  Such disagreements are telling.

Of course, in the United States jurisdictions that permit physician-assisted suicide, the practice is currently limited to patients who have six months to live.  The descent down the slippery slope in the Netherlands, however, verifies the fear that jurisdictions in this country will find it difficult to limit the application of physician-assisted dying to the terminally ill.

V.

Perhaps most disturbingly, the Dutch practice of legalized euthanasia and physician-assisted suicide has quickly been extended to young children.  In the Netherlands, children "may themselves request euthanasia from the age of 12, although the consent of the parents or guardian is mandatory until they reach the age of 16.  Sixteen[-] and seventeen-year-olds do not need parental consent in principle, but their parents must be involved in the decision-making process.  From the age of 18, young people have the right to request euthanasia without parental involvement" (Government of the Netherlands, <u>Euthanasia, assisted suicide and non-resuscitation on request</u>, available at

https://www.government.nl/topics/euthanasia/contents/euthanasia-assisted-suicide-and-non-resuscitation-on-request [accessed August 21, 2017]).  Recently, the Dutch Pediatric Association has called for the age limit of 12 years old to be eliminated, so that "each child's ability to ask to die [w]ould be evaluated on a case-by-case basis" (<u>Dutch paediatricians: give terminally ill children under 12 the right to die</u>, The Guardian, June 19, 2015, available at https://www.theguardian.com/society/2015/jun/19/terminally-ill-children-right-to-die-euthanasia-netherlands [accessed August 21, 2017]).

This would put the Netherlands in line with Belgium. In 2014, a dozen years after the 2002 Belgian Act on Euthanasia legalized euthanasia and physician-assisted suicide for adults suffering from constant, unbearable suffering (whether physical or psychiatric) that cannot be alleviated, Belgium legalized euthanasia by lethal injection for similarly situated children, of any age, provided they possess "the capacity of discernment" and there is parental consent (<u>Belgium passes law extending euthanasia to children of all ages</u>, The Guardian, 13 February 2014, at https://www.theguardian.com/world/2014/feb/13/belgium-law-extends-euthanasia-children-all-ages [accessed August 21, 2017]).

The expansion of euthanasia to children needs little commentary.  Our society recognizes that minors "are in the earlier stages of their emotional growth, that their intellectual

development is incomplete, that they have had only limited

practical experience, and that their value systems have not yet

been clearly identified or firmly adopted" (People ex rel.

Wayburn v Schupf, 39 NY2d 682, 687-688 [1976]).  The immaturity

of children makes them especially vulnerable.  The Dutch

extension of euthanasia to minors is further proof that it is

reasonable to fear the consequences of legalizing physician-

assisted suicide.[5]

VI.

The evidence from other countries is that legitimating

physician-assisted suicide can lead to the acceptance of non-

voluntary euthanasia and to the extension of physician-assisted

suicide to patients, such as those suffering from depression, who

are not terminally ill.  Such developments, valuing the avoidance

of suffering above all virtues of endurance and hope for the

future, should be intensely disturbing to all of us.  The risk of

facilitating such a bleak prospect is a rational justification

for New York's prohibition of assisted suicide.

---

[5]      There is also evidence of an extension of the practice
of physician-assisted suicide to non-physicians in the
Nethelands.  A Dutch "suicide counselor" was acquitted of helping
a 54-year-old woman kill herself, despite advising her on the
quantity of drugs to be taken to be certain of death (T. Sheldon,
Dutch court acquits suicide counsellor of breaking the law, 334
BMJ 228 [2007], available at https://www.ncbi.nlm.nih.gov/pmc/
articles/PMC1790785 [accessed August 21, 2017]).

Myers v Schneiderman

No. 77

GARCIA, J. (concurring):

I agree with and join in the Court's holdings that Penal Law § 120.30 and § 125.15 (3) encompass aid-in-dying (per curiam at Section III), and that the statutes do not violate plaintiffs' right to equal protection under the New York State Constitution (per curiam at Section IV.A.). To the extent plaintiffs' allegations overlap with those asserted in Washington v Glucksberg (521 US 702 [1997]), I also agree with the Court's conclusion that, here, our State Due Process Clause is no broader than its federal counterpart and, therefore, plaintiffs' claims must fail. I write separately because I believe the Court should go further; to the extent plaintiffs' assert a "more particularized" challenge to the assisted suicide statutes (id. at 750 [Stevens, J., concurring]), I would expressly reach -- and reject -- those claims.

I.

In support of their due process claim, plaintiffs argue that the assisted suicide statutes burden a fundamental right and that, even if they do not, the statutes cannot survive rational basis review. These precise arguments were asserted under the Federal Constitution in Washington v Glucksberg (521 US 702

- 1 -

[1997]), and were rejected by the United States Supreme Court. Accordingly, unless our State Due Process Clause supplies broader protection, plaintiffs' claim here must similarly fail.

A.

In <u>Washington v Glucksberg</u>, the Supreme Court rejected the plaintiffs' due process challenge to Washington's prohibition against "caus[ing]" or "aid[ing]" a suicide (521 US 702, 705 [1997]). There, the Court determined that the "right" to assistance in committing suicide asserted by the plaintiffs was "not a fundamental liberty interest protected by the Due Process Clause" of the Federal Constitution (<u>id.</u> at 728). Because Washington's ban on assisted suicide was "at least reasonably related" to a number of "important and legitimate" state interests, the Court concluded that it survived rational basis review and that it did not violate the Due Process Clause of the Fourteenth Amendment (<u>id.</u> at 735 [citation and quotation marks omitted]).

Addressing the scope of its ruling, the Court carefully framed the issue presented: "It is the [lower] court's holding that Washington's physician-assisted suicide statute is unconstitutional as applied to the class of terminally ill, mentally competent patients that is before us today" (id. at 709 n 6 [citation and quotation marks omitted]).[1] Accordingly, the

---

[1] Although the lower court's holding "was not limited to a particular set of plaintiffs before it" (id. at 709 n 6, quoting id. at 739 [Stevens, J., concurring]), the Court determined that

Supreme Court's holding affirmed the validity of the Washington

statute both "on its face" and "as applied to competent,

terminally ill adults who wish to hasten their deaths by

obtaining medication prescribed by their doctors" (id. at 735

[citation and quotation marks omitted]).

The same conclusion is warranted under our State Due

Process Clause.

### B.

In general, our Court "use[s] the same analytical

framework as the Supreme Court in considering due process cases"

(Hernandez v Robles, 7 NY3d 338, 362 [2006]).  While, "[w]e have,

at times, held that our State Due Process Clause provides greater

protections than its federal counterpart" (per curiam at 9,

citing People v Aviles, 28 NY3d 497, 505 [2016]; see also People

v P.J. Video, 68 NY2d 296, 302-303 [1986]), I agree with the

Court's conclusion that this is not one of those times.

In Glucksberg, the Supreme Court began by considering

our Nation's "history, legal traditions, and practices" with

respect to aid-in-dying, emphasizing New York's pivotal role at

the forefront of legislative efforts to punish assisted suicide

(Glucksberg, 521 US at 710-719).  Like most states, New York has

"consistently condemned, and continue[s] to prohibit, assisting

---

it had nonetheless ruled on the statute's constitutionality "as
applied to members of a group" -- an approach that is "not
uncommon" (id. at 709 n 6, citing Compassion in Dying v
Washington, 79 F.3d 790, 798 n 9 [9th Cir 1996 en banc]).

suicide" (id. at 719).  The earliest American statute explicitly outlawing assisted suicide was enacted in New York nearly two centuries ago, with many States and Territories later following New York's example (see id. at 715 [citations omitted]).  In 1857, a New York commission led by Dudley Field drafted a criminal code that prohibited "aiding" a suicide (id. [citation omitted]).  The Field Code was adopted in New York in 1881, and "its language served as a model for several other western States' statutes" (id. [citation omitted]).  The language of the prohibition remained largely unchanged until 1965, when Penal Law § 120.30 and § 125.15 (3) were enacted as part of a "new Penal Law" that "reorganize[d] and modernize[d] penal provisions proscribing conduct which has traditionally been considered criminal" (Governor's Approval Mem, Bill Jacket, L 1965, ch 1030 at 35).

Since then, the statutes have been repeatedly reexamined, including by New York's Task Force on Life and the Law, which studied physician-assisted suicide and unanimously concluded that the "potential dangers" of such a "dramatic change in public policy would outweigh any benefit that might be achieved" (Glucksberg at 719 [citation omitted]).  Despite repeated attempts to legalize aid-in-dying in New York, the Legislature has not retreated from its prohibition.

To be sure, "the common law of New York" recognizes a patient's right "to determine what shall be done with his own

body and to control the course of his medical treatment" (Rivers v Katz, 67 NY2d 485, 492 [1986]; see also Schloendorff v Society of New York Hospital, 211 NY 125, 129-130 [1914]).  In Matter of Storar, we explicitly recognized a competent patient's right to refuse medical treatment, even where the treatment may be necessary to preserve the patient's life (52 NY2d 363, 369 [1981]).  We again recognized the right of "a competent adult to refuse treatment" in Matter of Fosmire, where we held that the patient -- "an adult Jehovah's Witness [who] refused to consent to blood transfusions" -- had a "right to decline the transfusions" even though they were "necessary to save her life" (75 NY2d 218, 221, 226 [1990]).  And today, we reaffirm a patient's fundamental right to refuse life-saving medical care or treatment (per curiam at 1-2, 9-10).

But we have never defined this fundamental right to encompass the broad "right to die" that plaintiffs seek; rather, we have consistently reaffirmed the widely-recognized distinction between refusing life-sustaining treatment and assisted suicide (per curiam at 10, citing Matter of Bezio v Dorsey, 21 NY3d 93, 103 [2013]; Matter of Fosmire, 75 NY2d at 227; Storar, 52 NY2d at 377 n 6).  This distinction "comports with fundamental legal principles of causation and intent" (Vacco v Quill, 521 US 793, 801 [1997]).  When a patient refuses life-sustaining treatment and succumbs to illness, the cause of death is the underlying disease.  By contrast, when a lethal medication is ingested, the

cause of death is not the pre-existing illness, but rather, the prescribed medication. In addition, a physician who withdraws treatment or administers terminal sedation does not intend to kill the patient, though that may be the eventual result. Rather, the physician intends only to respect the patient's right to die naturally and free from intrusion, and to alleviate any pain or discomfort that may accompany that decision. A physician who provides aid-in-dying, however, indisputably intends for his or her actions to directly cause the patient's death; that is the very purpose of the lethal prescription.[2]

New York's "consistent and almost universal tradition" has "long rejected the asserted right, and continues to explicitly reject it today" (Glucksberg, 521 US at 723). The assisted suicide statutes reflect the Legislature's longstanding and considered policy choice, and we decline to "place the matter outside the arena of public debate" by extending heightened constitutional protection (id. at 720). Accordingly, in light of

---

[2] Judge Rivera's assertion that "the intent of a third party who assists the patient" is "irrelevant" to the legal analysis (J. Rivera concurring op at 18) ignores the factual foundation of plaintiffs' claim: plaintiffs seek a constitutional right not only to hasten death, but to the affirmative assistance of another in doing so. As the Supreme Court explained, "[t]he law has long used actors' intent or purpose to distinguish between two acts that may have the same result," and on this basis, "many courts, including New York courts, have carefully distinguished refusing life-sustaining treatment from suicide" (Vacco, 521 US at 803). Comporting with this fundamental legal principle, the State may rationally distinguish between various end-of-life practices.

New York's persistent and unambiguous legal practice, plaintiffs' asserted right to aid-in-dying is not a fundamental right under our State Due Process Clause.

Because the assisted suicide statutes do not implicate a fundamental right, they need only be "rationally related to any conceivable legitimate State purpose" (People v Walker, 81 NY2d 661, 668 [1993] [citations omitted]).  As the rational basis test is "the most relaxed and tolerant form of judicial scrutiny," plaintiffs bear the "heavy burden" of defeating the "strong presumption" that the statutes are valid (City of Dallas v Stanglin, 490 US 19, 26 [1989]).  Even if the State could "better promote and protect" its interests "through regulation, rather than prohibition, of physician-assisted suicide," our inquiry is "limited to the question whether the State's prohibition is rationally related to legitimate state interests" (Glucksberg, 521 US at 728 n 21).  So long as this basic requirement is satisfied, we "need not weigh exactingly the relative strengths" of the various competing interests (id. at 735).[3]

_____

[3] The analysis in Judge Rivera's concurring opinion -- which concludes that the State's interests "do not outweigh" a patient's right as death draws near (J. Rivera concurring op at 2; see also id. at 10, 12, 21, 23, 27) -- bears little resemblance to our well-established rational basis review. Rational basis is not a balancing test.  Rather, under this relaxed standard, plaintiffs' claims must fail so long as any conceivable legitimate State interest supports the challenged legislation (Affronti, 95 NY2d at 719 [citation omitted]).  As discussed below, the assisted suicide statutes "easily satisfy" this requirement (Vacco, 521 US at 809).

A number of legitimate State interests support the assisted suicide statutes.  First, the State has a significant interest in preserving life and preventing suicide (per curiam at 12; see also Storar, 52 NY2d at 377; Bezio, 21 NY3d at 104; Glucksberg, 521 US at 729).  Suicide presents a "serious public health problem," often plaguing those who "suffer from depression or other mental disorders" -- conditions that may be difficult to diagnose (Glucksberg, 521 US at 730 [citation omitted]).  The availability of assisted suicide would therefore undermine the State's interest in preventing suicide in cases involving, for instance, untreated depression, coercion, or improperly managed pain.

Additionally, the State has a substantial interest in guarding against the risks of mistake and abuse.  Physicians are often unable to accurately ascertain how much time a terminally-ill patient has remaining, or may misdiagnose an illness as terminal, thereby creating a risk that patients will elect assisted suicide based on inaccurate or misleading information (Amicus Brief of The 39 Physicians, at 17-19).  Moreover, assisted suicide presents substantial "risks . . . to the elderly, poor, socially disadvantaged, and those without access to good medical care" (Task Force, When Death Is Sought: Assisted Suicide and Euthanasia in the Medical Context [May 1994]).  The State has a valid interest in protecting these vulnerable groups from the societal, familial, and financial pressures that might

influence a patient's decision to pursue aid-in-dying (Glucksberg, 521 US at 731; Brief of Disability Rights Amici, at 10, 15-16; Amicus Brief of The 39 Physicians, at 11).

The State has also asserted a valid interest in preserving the integrity of the medical profession.  A number of medical professionals -- including the American Medical Association, the Medical Society of the State of New York, the New York State Hospice and Palliative Care Association, and the New York State Task Force on Life and the Law -- expressly reject physician-assisted suicide as an accepted medical practice (e.g. Brief of The 39 Physicians, at 4-13).  Many believe that "physician-assisted suicide is fundamentally incompatible with the physician's role as healer," and could "undermine the trust that is essential to the doctor-patient relationship by blurring the time-honored line between healing and harming" (Glucksberg, 521 US at 731 [citations and quotation marks omitted]).

The Supreme Court has recognized that these, and other, "valid and important public interests" support New York's assisted suicide statutes (Vacco, 521 US at 809).  Each of these State interests, by itself, "easily satisf[ies] the constitutional requirement that a legislative classification bear a rational relation to some legitimate end" (id.); collectively, they overwhelmingly substantiate the Legislature's prohibition of aid-in-dying.  Accordingly, as in Glucksberg, the assisted suicide statutes do not violate our State Due Process Clause

either on their face or "as applied to competent, terminally ill adults who wish to hasten their deaths by obtaining medication prescribed by their doctors" (Glucksberg, 521 US at 735 [citation and quotation marks omitted]).

## II.

Despite the breadth of Glucksberg's holding, plaintiffs -- and others -- suggest that the Supreme Court left open the possibility that some other plaintiff, under some other set of circumstances, might successfully assert an as-applied challenge to an assisted suicide ban (see Glucksberg, 521 US at 738-788 [Stevens, J., concurring]; see also per curiam at 10; Morris v Brandenberg, 376 P3d 836, 847 [NM 2016]; James Bopp, Jr. & Richard E. Coleson, *Three Strikes: Is An Assisted Suicide Right Out?*, 15 Issues L. & Med. 3, 35-36 [1999]; Adam J. Cohen, *The Open Door: Will the Right to Die Survive* Washington v Glucksberg *and* Vacco v Quill?, 16 In Pub. Int. 79, 98-107 [1997]; *Physician-Assisted Suicide*, 111 Harvard Law Rev. 237, 243-45 [1997]). Although plaintiffs here assert a more particularized challenge to the assisted suicide statutes, their as-applied challenge nonetheless fails.

## A.

In Glucksberg, Justice Stevens, concurring in the judgment, asserted that the Court had conceived of the plaintiffs' claim "as a facial challenge -- addressing not the application of the statute to a particular set of plaintiffs

before it, but the constitutionality of the statute's categorical prohibition" against assisting a suicide (<u>Glucksberg</u>, 521 US at 740 [Stevens, J., concurring]).  Specifically, Justice Stevens noted that all three of the terminally ill patient-plaintiffs had died during the pendency of the litigation, and the Court therefore "did not have before it any individual plaintiff seeking to hasten her death or any doctor who was threatened with prosecution for assisting in the suicide of a particular plaintiff" (<u>id.</u> at 739 [Stevens, J., concurring]).  Accordingly, Justice Stevens contended that the Court's holding left open "the possibility that some applications of the statute might well be invalid" (<u>id.</u> [Stevens, J., concurring]).

Writing for the majority, Chief Justice Rehnquist conceded that the Court's opinion did not "absolutely foreclose" the possibility that "an individual plaintiff seeking to hasten her death, or a doctor whose assistance was sought, could prevail in a more particularized challenge" (<u>id.</u> at 735 n 24, citing <u>id.</u> at 750 [Stevens, J., concurring]).  But to the extent the Court left open the prospect of a successful future due process challenge, its concession was a narrow one.  The Court made clear:  "[G]iven our holding that the Due Process Clause of the Fourteenth Amendment does not provide heightened protection to the asserted liberty interest in ending one's life with a physician's assistance, such a claim would have to be *quite different* from the ones advanced by [the] respondents here" (id.

at 735 n 24 [emphasis added]; see also Vacco, 521 US at 809 n 13).  In the twenty years since Glucksberg was decided, not a single plaintiff has asserted a successful constitutional challenge to an assisted suicide ban.

B.

Plaintiffs here explicitly seek to present the "more particularized" as-applied challenge purportedly "not foreclose[d]" by Glucksberg (Glucksberg, 521 US at 739 [Stevens, J., concurring]).  As detailed in the complaint, plaintiffs' allegations encompass a number of diverse parties whose experiences span the myriad stages of terminal illness.[4]

At the time the complaint was filed, plaintiffs included three competent, terminally ill patients who sought "to declare unconstitutional the application of New York penal law" to their respective circumstances.  These patient-plaintiffs requested, among other things, the option to "ingest medications prescribed by [their] doctor[s] to achieve a peaceful death."

Plaintiffs also include a number of medical providers, including physicians whose patients "have requested" assistance to "help them die peacefully and with dignity."  As alleged in the complaint, each physician-plaintiff, in the course of his

---

[4] Given the breadth and nature of plaintiffs' allegations, outlined briefly below, I agree with Judge Rivera's implicit determination that plaintiffs' claims encompass the "sub-group of patients" who have entered the "final stage of the dying process" (J. Rivera concurring op at 2-3).  Our disagreement concerns the merits -- rather than the scope -- of these claims.

current medical practice, "regularly encounters mentally-competent, terminally-ill patients who have no chance of recovery and for whom medicine cannot offer any hope other than some degree of symptomatic relief."  In some of those cases, "even symptomatic relief is impossible to achieve without the use of terminal sedation."  An "[u]ncertainty about the application" of the assisted suicide statutes deters these medical professional from "exercising [their] best professional judgment to provide aid-in-dying."

Plaintiffs allege, among other things, that the assisted suicide statutes "violate[] the patient [p]laintiffs' rights (and the rights of the physician [p]laintiffs' mentally-competent, terminally-ill patients . . . and [End of Life Choices New York]'s mentally-competent-terminally-ill clients) . . . in violation of the Due Process Clause of the New York Constitution."  They seek a declaration that "the application" of the assisted suicide statutes to plaintiffs' conduct violates the New York Constitution, as well as an order enjoining defendants "from prosecuting [p]laintiffs for seeking or providing aid-in-dying."

C.

Plaintiffs' challenge, though more particularized, is not meaningfully "different" from the claims rejected in Glucksberg (521 US at 735 n 24).  Given our holding that the Due Process Clause of the New York State Constitution does not

provide heightened protection to the asserted liberty interest, plaintiffs must show, with respect to their as-applied challenge, that the assisted suicide statutes no longer survive rational basis review.  Plaintiffs cannot make the requisite showing because, despite the uniquely compelling interests of the terminally ill "facing an impending painful death" (J. Rivera concurring op at 10), the State's asserted interests subsist even where a patient is "in the final stage of life" (J. Rivera concurring op at 20).

The legitimate interests advanced by the State support the assisted suicide statutes irrespective of a patient's proximity to death or eligibility for terminal sedation.  For instance, the State may permissibly conclude that its interest in preserving life does not "diminish" merely because a patient's death may be "certain" or "imminent" (J. Rivera concurring op at 2, 27).  Rather, research demonstrates that "suicidal feelings in terminally ill people" are often "remediable through other means, including pain management, hospice services and counseling," notwithstanding the patient's impending or imminent death (Brief of Disability Rights Amici, at 21).  In the State's view, this data may undermine any assurance that, in the "last stage of life," a patient's "choice is not motivated by depression and helplessness, but by the desire to exercise autonomy to achieve a peaceful death" (J. Rivera concurring op at 22-23).

The risk of misuse similarly persists regardless of a

patient's "stage of the dying process" (J. Rivera concurring op at 2). Indeed, "many patients prescribed [lethal] drugs do not ultimately take them" (J. Rivera concurring op at 15 n 5), creating a substantial danger that the dosage will be deliberately or accidentally misused. While that risk may be "no more" than with other dangerous drugs (J. Rivera concurring op at 26), the State's legitimate interest does not fail merely because the assisted suicide statutes do not "cover every evil that might conceivably have been attacked" (McDonald v Board of Election Commissioners of Chicago, 394 US 802, 809 [1969]). Moreover, given the lethal repercussions of misuse -- the dosage is deliberately designed to cause death -- the Legislature's targeted effort to address this uniquely acute risk is certainly rational (Williamson v Lee Optical Co, 348 US 483, 489 [1955] [noting that the State may act "one step at a time, addressing itself to the phase of the problem which seems most acute"]).

Nor does the State's interest in promoting sound medical ethics dissipate as death draws near (J. Rivera concurring op at 23-26). To the contrary, the State has asserted that the assisted suicide statutes encourage the unconditional treatment of the terminally ill and preserve the critical element of trust in a doctor-patient relationship at a time often marked by intense fear, uncertainty, and vulnerability. Even assuming this asserted rationale is "not uniformly accepted" (J. Rivera concurring op at 23), skepticism of aid-in-dying unquestionably

remains among well-regarded medical professionals, including a number of the State's amici in this case. The State is entitled to adopt this legitimate medical perspective, which, by itself, adequately substantiates the assisted suicide statutes.

In any event, the State may permissibly conclude that an absolute ban on assisted suicide is the most reliable, effective, and administrable means of protecting against its inherent dangers (per curiam at 14; see also Glucksberg, 521 US at 731-733). Indeed, the State's legitimate interest in promoting a bright-line rule is particularly evident when considering the challenges posed by regulation. For instance, Judge Rivera's proposed rule, which would permit aid-in-dying in the "last painful stage of life," would purportedly apply only where a patient qualifies as "mentally competent" and "terminally ill"; where the patient is "experiencing intractable pain and suffering"; where "pain treatment is inadequate"; where death is "certain" and "imminent"; and where the patient's choice "is not motivated by depression and helplessness" (J. Rivera concurring op at 2, 3, 11, 23, 27). But the concurrence fails to offer any concrete guidance regarding how these amorphous threshold eligibility determinations should be made. Faced with these complex and delicate calculations, the Legislature may rationally conclude that the clarity and certainty of an absolute ban best protects against the inherent risks of physician-assisted suicide.

                              III.

          The Due Process Clause of our State Constitution does

not encompass a fundamental right to physician-assisted suicide,

and the State's prohibition is rationally related to a number of

legitimate government interests -- interests that support the

assisted suicide statutes irrespective of a patient's "stage of

the dying process" (J. Rivera concurring op at 2, 11).  To the

extent a hypothetical future plaintiff -- presenting a "quite

different" set of circumstances -- might come forward, the

prospect of a successful constitutional challenge is never

"absolutely foreclose[d]" (Glucksberg, 521 US at 735 n 24).  But

in light of the Court's holding today -- and our unanimous

conclusion that heightened scrutiny is unwarranted -- it is

difficult to conceive of such a case.  Plaintiffs' claims are

better addressed to the Legislature.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order affirmed, without costs.  Opinion Per Curiam.  Judges
Rivera, Stein, Fahey, Garcia and Wilson concur, Judge Rivera in a
concurring opinion, Judge Fahey in a separate concurring opinion,
and Judge Garcia in a separate concurring opinion in which Judge
Stein concurs.  Chief Judge DiFiore and Judge Feinman took no
part.

Decided September 7, 2017